FRANK BURBRIDGE AND ANGELA BURBRIDGE, HIS WIFE; JOHN E. BURBRIDGE AND MARY BURBRIDGE, HIS WIFE; JOSEPH P. BURBRIDGE AND ELAINE BURBRIDGE, HIS WIFE, PLAINTIFFS-RESPONDENTS, v. THE GOVERNING BODY OF THE TOWNSHIP OF MINE HILL, AND THE ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF MINE HILL, DEFENDANTS-RESPONDENTS, AND JOHN G. PAS-CHAL, DEFENDANT-APPELLANT, AND THELMA PASCHAL, DEFENDANT.

Argued January 30, 1989—Decided January 23, 1990.

*Abraham M. Akselrad* argued the cause for appellant (*Lovas & Akselrad,* attorneys).

*Jeffrey E. Michelson* argued the cause for respondents The Governing Body of the Township of Mine Hill and The Zoning Board of Adjustment of the Township of Mine Hill (*Weiner & Weiner,* attorneys).

*Richard T. Sweeney* argued the cause for respondents Frank Burbridge and Angela Burbridge, his wife; John E. Burbridge and Mary Burbridge, his wife; Joseph P. Burbridge and Elaine Burbridge, his wife, (*Sears, Sweeney & Weininger,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal focuses on the special reasons and negative criteria that guide a zoning board's consideration of an application for a variance under *N.J.S.A.* 40:55D–70d. The variance in question sought expansion of a pre-existing nonconforming use of the applicant's property for commercial purposes in a residential zone.

Specifically, the variance, which was granted by the municipal zoning board of adjustment, allowed the applicant to expand the bounds of his automobile junkyard-storage area, which is one component of his auto salvage, repair, and sale business. As a trade-off for expansion of the storage area, the applicant proposed to reorganize and relocate all of the nonconforming aspects of his business and move his auto-repair and sale activities from the front of his property to the back, out of view from the front street. The zoning board anticipated that the proposed arrangement would clear up a sprawling and unsightly mess. It granted the expansion because the aesthetic benefits of the proposed plan and the societal benefits gained

through the increased recycling of automobile parts constituted special reasons and satisfied the negative criteria.

The municipal governing body reached the same conclusion, as did the Law Division, but the Appellate Division reversed, finding no evidential support in the record for the conclusion that aesthetics and recycling benefits satisfied the statutory requirements of special reasons or the negative criteria. We granted certification, 111 *N.J.* 627 (1988), and now reverse and reinstate the judgment of the Law Division sustaining the grant of the variance.

## I

The applicant for the variance is defendant John Paschal. He resides on the property in question with his wife, defendant Thelma Paschal. Hereafter "defendant," "the applicant," and "Paschal" refer to John Paschal.

The Paschals' property is a square-shaped, flat-terrained plot of 1.029 acres with a 250-foot front on Thomastown Road in the Township of Mine Hill. The depth of the property extends west approximately 190 feet from the centerline of Thomastown Road, which runs north-south. Although the Paschals' property and most of the property in the surrounding area is now zoned only for residential use, defendant's business—salvaging auto parts and fluids, repairing and refurbishing old cars, and selling the rebuilt autos—is permitted because the commercial use predates the first ordinance that zoned the property for residential use. That 1951 ordinance had the legal effect of converting the then-existing permissible auto-repair-shop operation into a nonconforming use.

The Paschals' residence is centered roughly on the property line running along Thomastown Road and is set back from the road approximately forty feet. The hub of defendant's automobile operations is a garage, separate from the residence and located on the northern edge of the property at the end of a gravel driveway approximately sixty feet long leading to the

road. Paschal repairs and refurbishes cars in the garage and along the driveway. In the past he has used the area in front of the driveway to display the rebuilt autos that he seeks to sell. In addition, he apparently leaves out in the front wrecked autos that he is in the process of dismantling. Under the 1951 ordinance, the effect of which was to permit the current nonconforming use, Paschal has the right to continue repairing and displaying automobiles on the northern side of the front of his property, along the gravel driveway. Thus, the current use exposes the residents of Thomastown Road to views of raw automotive-repair work. Moreover, the nonconforming use is clearly demarked from the road by a large sign attached to the garage advertising Paschal's services.

In 1979, as a condition to his obtaining a salvage dealer's license, Paschal was required under the Township junkyard ordinance to build a fence enclosing an area in which the used-automobile and salvaged parts could be stored safely, out of public view. At a cost of $25,000 defendant built a ten-foot high, solid-wood plank fence at the rear of his property. However, that fence encloses an area substantially larger than the space enclosed by a storage area fence that previously existed on the property, built by Paschal's predecessor, Nick Hryhor. Whereas the Hryhor fence enclosed a storage area of only about 15,000 square feet near the northwest corner of the property, defendant's fence surrounds a space of about 25,000 square feet, thereby creating more than 10,300 square feet of new automobile-storage space by enclosing most of the southern half of the property, including the area previously bounded by the Hryhor fence.

Plaintiffs, all members of the Burbridge family, own and reside on three parcels of land on Thomastown Road in the vicinity of the Paschals' property. The construction of defendant's "new" fence prompted earlier litigation by these same plaintiffs, who sought removal of the fence on the ground that it represented an improper expansion of the pre-existing nonconforming use of the property as a junked-auto storage area.

Plaintiffs prevailed at the trial level in that suit, and the Appellate Division affirmed judgment in their favor in an unpublished opinion in January 1985. The basis for that decision was that Paschal's fence enclosed an area that illegally expanded the pre-existing storage area, which was held to be limited to the space enclosed by the Hryhor fence. The court restrained Paschal from storing autos in the fenced-in area that lay in the southern half of the property, and ordered defendant to remove the offending portions of his fence. When defendant did not remove the fence, plaintiffs brought a motion seeking an Order in Aid of Litigant's Rights to compel removal of the fence. See *Rule* 1:10–5. The court dismissed the motion without prejudice, but ordered defendant to seek a variance, pursuant to *N.J.S.A.* 40:55D–70d, to legitimize the expansion of the nonconforming storage area.

Paschal thereupon applied to the Mine Hill Zoning Board of Adjustment (the Board) for the necessary variance to expand four features of the existing nonconforming use. That application forms the basis for this suit. Paschal sought permission (a) to use the entire space enclosed by his $25,000 fence, thereby substantially expanding the auto-storage area; (b) to create on the southern part of the property a second gravel driveway leading to the storage area; (c) to widen to forty feet the gravel drive to the garage in the northern section, thereby creating an area forty feet wide that would allow parking for three cars; and (d) to use as an office for the auto-service business the two rooms that he had added to the garage in 1977.

In exchange for the variance Paschal proposed to re-organize and relocate the other nonconforming uses on the property and in general to clean up the auto-repair and salvage operations. As part of his application defendant agreed to move the auto-repair and sale operations from the front of the garage and continue those activities only in the backyard storage area. Between 3,700 and 3,900 square feet of front property, visible from the street, would no longer be dedicated to a nonconform-

ing use. The application also proposed that the front of the property be landscaped with bushes and shrubs to hide the storage-area fence and to screen defendant's operations from public view. In addition, Paschal offered to remove the large "Auto Body Repair" sign hanging from the garage and to replace it with a more tasteful sign, stating only "Paschal's" and hanging from a low post in front of the property.

At the hearing before the Board four witnesses testified in support of the application. No one testified in opposition. Two supporters were neighbors who reacted favorably to the likelihood that the proposed changes would improve the appearance of the property. The third witness was a professional land planner and development consultant whose firm had designed the landscaping plan for the property. He believed that approval of the application would have a "positive impact" on Thomastown Road and on the neighborhood and would result "not [in] a detriment to the zone plan * * * [but in] a benefit to the neighborhood." Finally, a real-estate broker and appraiser gave his opinion that the proposal would have only a positive effect on property values in the surrounding neighborhood because "taking the parking off of [the garage] side, pulling it into an area which really cannot be seen from the street * * * would help the saleability and * * * pricing."

Considering only the evidence presented before it and expressly disregarding the record in the previous litigation, which it deemed "irrelevant," the Board clearly saw the application as an opportunity to clean up a rambling, offensive, and unsafe operation. It therefore granted the variance to expand the storage area. In addition to barring all automotive-repair work visible from the front of the property, the Board imposed a host of restrictions to regulate the nonconforming use. The Board resolution lists nineteen conditions to which the variance grant is subject, such as limiting the hours of operation, limiting the quantities of tires and flammable materials stored on the property, prohibiting defendant from using a crusher to compact the automobiles, regulating the type and placement of shrubbery in

the front of the property, and forbidding customer parking on Thomastown Road.

In its resolution the Board articulated two distinct special reasons for granting the variance. The overriding reason was that the public would benefit from the re-organization and re-positioning of the nonconforming uses, which would now conform better to the residential quality of the zone, be more aesthetically pleasing in general, and permit the Township greater control over the property. The resolution states:

> The Board believes that even if the salvage yard was limited to the existing permissible storage area, * * * the aesthetic nature of the use of the property in question does not fit in any shape or form with the character of a residential neighborhood. However, by allowing the expansion in question, the Board retains the control necessary to make certain fundamental changes in the way the applicant operates the business and also to clean up the site in question so that the purposes and intent of the Mine Hill Township zoning ordinance and of the Municipal Land Use Law will be furthered by virtue of elimination of some of the conditions which now exist on the property in question.

Convinced that the salvaging of auto parts was "essentially the business of recycling," the Board also found an additional affirmative ground for granting the variance. The resolution states that "it is in the best interest of the community to allow for recycling of such materials since it [both] supports * * * a conservation of energy and * * * eliminates the abandonment of automobiles" and that the sale of recycled auto parts "provides a source of automobile parts at a reduced cost to members of the public."

As for the negative criteria the Board found no evidence from which to conclude that the grant of a variance would either be a substantial detriment to the public good or substantially affect the intent and purpose of the zoning laws. It cited the enhanced aesthetic quality and the recycling benefits gained from the proposal as supporting its conclusion that the variance would not "affect[ ] either the zoning ordinance or the public welfare * * *."

The Burbridges appealed the variance grant to the municipal governing body, which affirmed the grant after a *de novo*

review. The Law Division upheld that decision, but the Appellate Division, in an unreported opinion, reversed and set aside the variance. Although it found the aesthetic benefits of the proposal "laudable," the court nevertheless concluded that in this case aesthetics could not support the requirement of special reasons "since the proposed expansion is of such a magnitude that the aesthetic improvements claimed are incidental." The court below was similarly unimpressed with the public benefits of recycling as a special reason as it was with the applicant's effort to establish that the subject property was particularly suitable for the proposed use. The Appellate Division observed that "[t]here were no such findings, and the record fail[ed] to establish any basis for such a finding." Finally, the court below concluded that there was no "adequate evidence in the record that the zoning benefits outweigh the zoning harm."

## II

Some basic principles bear restating.

A board of adjustment has authority to grant a variance and permit the nonconforming use of zoned property pursuant to *N.J.S.A.* 40:55D–70d, which confers on a board the power, "[i]n particular cases and for special reasons," to

> grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure, (2) an expansion of a nonconforming use * * *. A variance under this subsection shall be granted only by affirmative vote of at least five members, in the case of a municipal board * * *.

The same statutory section sets forth these negative criteria:

> No variance or other relief can be granted under the terms of this section unless such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

■ The statute makes plain that before a board of adjustment may grant a variance, it must make two critical findings: (1) that "special reasons" exist for the variance, and (2) that the variance "can be granted without substantial detriment to public good and will not substantially impair the intent and

purpose of the zone plan and zoning ordinance." *See Kohl v. Mayor of Fair Lawn,* 50 *N.J.* 268, 276 (1967); *Pieretti v. Mayor of Bloomfield,* 35 *N.J.* 382, 387 (1961); *Andrews v. Board of Adjustment, Ocean Township,* 30 *N.J.* 245, 249 (1959); *Kessler v. Bowker,* 174 *N.J.Super.* 478, 485 (App.Div.1979), certif. denied, 85 *N.J.* 99 (1980). Just as a board of adjustment can grant a variance to create a new nonconforming use on a showing of "special reasons" and satisfaction of the negative criteria, so may it grant a variance, under the same standard, to enlarge a pre-existing nonconforming use. *Grundlehner v. Dangler,* 29 *N.J.* 256, 269 (1959).

In determining whether to uphold the grant of a variance, the reviewing court must consider each case on its own facts. *Grundlehner v. Dangler, supra,* 29 *N.J.* at 267; *Kessler v. Bowker, supra,* 174 *N.J.Super.* at 485. This Court has stated that "[v]ariances to allow new nonconforming uses should be granted only sparingly and with great caution since they tend to impair sound zoning." *Kohl v. Mayor of Fair Lawn, supra,* 50 *N.J.* at 275; *Grundlehner v. Dangler, supra,* 29 *N.J.* at 266. However, a court's review of a grant of a variance is limited to whether the municipal authorities could reasonably have concluded from the evidence that a special reason existed and that the negative criteria for granting a variance have been satisfied. A court should sustain a local zoning board's determination to grant a zoning variance if that board's decision comports with the statutory criteria and is founded on adequate evidence. *Fobe Assocs. v. Mayor of Demarest,* 74 *N.J.* 519, 538 (1977). If there is such support in the record, approval will not be deemed arbitrary or capricious. *Kramer v. Board of Adjustment, Sea Girt,* 45 *N.J.* 268, 296 (1965). Boards of adjustment, "because of their peculiar knowledge of local conditions, must be allowed wide latitude in the exercise of the delegated discretion." *Medici v. BPR Co.,* 107 *N.J.* 1, 23 (1987); *Kramer v. Board of Adjustment, Sea Girt, supra,* 45 *N.J.* at 296.

-A-

Here the Board gave two special reasons for granting Paschal the authority to expand the auto-storage area: the reorganization of the other activities on the property caused the nonconforming use to be more aesthetically pleasing, and continued use of the property as an auto-salvage business served the public interest through the recycling of the auto parts.

Because "special reasons" takes its definition and meaning from the general purposes of the zoning laws, *Kohl v. Mayor of Fair Lawn, supra,* 50 *N.J.* at 276, we must look to the purposes of the Municipal Land Use Law (hereinafter MLUL), *N.J.S.A.* 40:55D-1 to -112, to determine what is a special reason. Those purposes are found in *N.J.S.A.* 40:55D-2 and include the promotion of the general welfare, of safety and health, of a desirable visual environment, and of the maximum practical recovery and recycling of re-usable materials. One court has stated that special reasons exist whenever a variance proposes to secure any of the statutory zoning goals. See *Yahnel v. Board of Adjustment of Jamesburg,* 79 *N.J.Super.* 509, 517 (App.Div.), certif. denied, 41 *N.J.* 116 (1963).

Historically, the zoning purpose most often relied on to prove special reasons sufficient to sustain a variance for a prohibited use is the promotion of the general welfare. *N.J.S.A.* 40:55D-2a; *see Andrews v. Board of Adjustment, Ocean Township,* 30 *N.J.* 245, 251 (1959). Proof that the proposed use was inherently beneficial to the public has frequently satisfied that standard. *See generally Medici v. BPR Co., supra,* 107 *N.J.* at 12 (listing cases focusing on inherently-beneficial uses). A proposed use that does not inherently serve the general welfare may nevertheless satisfy that statutory purpose of zoning if the proofs demonstrate that the use is "peculiarly fitted to the particular location for which the variance is sought." *Kohl v. Mayor of Fair Lawn, supra,* 50 *N.J.* at 279-80.

As noted, however, the MLUL includes zoning purposes other than the promotion of the general welfare. The proofs in this

case focused on the zoning purpose set forth in *N.J.S.A.* 40:55D–2i: "to promote a desirable visual environment through creative development techniques and good civic design and arrangement."

Although the general purposes of the zoning law include aesthetics, it is an open question whether aesthetics alone—that is, a more attractive use of the premises or a use more in keeping with the principles of the zoned area—can form the basis of a special reason justifying a variance to expand a pre-existing nonconforming use.

In *Kohl v. Mayor of Fair Lawn, supra,* 50 *N.J.* 268, this Court expressly left the issue undecided but held that aesthetics alone could not justify an expansion of a nonconforming dairy-bottling operation when the expansion would more than triple the size of that operation:

> We do not question the finding of the Board of Adjustment that the new construction would result in a more attractive plant than exists at present. While we do not decide whether esthetic considerations may provide a special reason for the grant of a variance in a proper case, they do not support this proposed construction of a half-million dollar expansion of an industrial complex in a residential zone. To justify the extensive expansion contemplated here by the increase in attractiveness of the property would open the way for any land to be used for any purpose, so long as the negative criteria are satisfied, if the facilities housing the use make the premises prettier than formerly. Such result would be contrary to established fundamentals of sound zoning. [*Id.* at 277.]

We are persuaded, however, that aesthetic improvement of a nonconforming use to create better conformity with the existing use within the surrounding area would likely be a primary focus of a local zoning board in deciding whether to grant an expansion of that use. We hold that in certain circumstances, such as those in this case, aesthetic improvement alone can be a sufficient special reason to justify a variance to expand a pre-existing nonconforming use.

When used to satisfy the "special reason" requirement, however, "aesthetic improvement" entails more than mere beautification. In this context, the phrase refers to the overall visual

compatibility of the use; it is inextricably entwined with notions of the general welfare.

■ A pre-existing nonconforming use is not one that can simply be taken away. Quite apart from any constitutional considerations, under the MLUL such a use exists as a matter of right. *See N.J.S.A.* 49:55D–68. When a nonconforming use cannot be eliminated, a municipality may and should seek to harmonize the use with its environs. To this end, the municipality ought to require aesthetic improvement as a condition of expansion. A municipality's ability to insist on specific changes as a part of the expansion safeguards the general welfare. Through heightened control, a municipality can minimize inconsistencies with permitted uses. Thus, the aesthetic improvements should be fashioned with an eye towards integrating the appearance of the use with its surroundings, not simply effecting cosmetic changes.

In this case the property now owned by the Paschals has been used as an auto salvage and repair yard since 1928. When the application before a board is to expand a nonconforming use, the competing considerations are clear: if the variance is denied, the hope is that the nonconforming use will wither and die; on the other hand, as long as the nonconforming use exists and is thriving, the Board obviously would want to make it conform as best it could with the current use-designation in the zone. When the special-reasons concept is applied to cases in which expansion is sought for pre-existing nonconforming uses, appearance, aesthetics, and compatibility of the use in the neighborhood become uniquely significant, especially when, as in this case, there is not any evidence that it is ever going to wither and die.

We have seen this principle at work in our earlier cases. Under the pre-MLUL zoning statute in *Grundlehner v. Dangler, supra,* 29 *N.J.* 256, owners of a funeral home, the use of which pre-dated a 1952 ordinance that zoned the area for residential use, received a variance to build an addition to their

funeral parlor. The addition was small in comparison to the size of the existing nonconforming use, inasmuch as it added 260 square feet to an already-existing structure of 1600–1700 square feet with fourteen rooms in two-and-a-half stories. The applicant argued that the proposed enlargement would hide from public view objectionable aspects of the funeral business, such as the carrying of caskets across the front yard and the congregating of large groups of mourners on the streets and sidewalks around the funeral parlor. This Court concluded that the proposed aesthetic benefits "would seemingly furnish sound grounds for ultimate findings that there were 'special reasons' within the contemplation of [the zoning statute] * * *," *id.* at 270; but because of defects in the zoning board's resolution, the Court remanded the cause to that board for further proceedings. Writing for the Court, Justice Jacobs noted, however, that expansions of existing nonconforming uses ordinarily are less disruptive to the zoning plan than new nonconforming uses:

> Since a variance may, upon a proper showing of special reasons within *N.J.S.A.* 40:55–39d, be granted to create a new nonconforming use in a residential zone, it may clearly be granted to enlarge a pre-existing nonconforming use; it is entirely evident that a limited extension of a pre-existing professional office, gasoline station, funeral home, shopping center or other business activity in a residential zone, will ordinarily be less likely to involve substantial impairment of the zoning plan than will the creation of a wholly new use of such nature. [*Id.* at 269.]

In *Kessler v. Bowker, supra,* 174 *N.J.Super.* 478, the defendant applied for a variance to expand his existing nonconforming use—an appliance and television store—in the historic village of Rancocas, West Hampton. The proposal sought permission to enclose an existing salvage and storage yard to create additional space. The primary "special reason" offered in support of the variance was that the addition would hide from public view an ugly and potentially hazardous waste area. The proposal sought to replace a small storage area enclosed by a wooden fence in the rear of the property with a larger brick building. Applying the MLUL, the Appellate Division determined that "beautifying an area, in the context of this applica-

tion, could be deemed a special reason justifying a variance to expand a nonconforming use." *Id.* at 486.

■ We agree with the cogent analysis in *Kessler.* In the instant case the aesthetic benefits, when weighed against the extent of the expansion, suffice as a special reason. We have repeatedly emphasized that a necessary concomitant of the increased power conferred on zoning boards, not just to recommend but to grant variances, is an exacting requirement for the development of standards. Planning, not *ad hoc* decision-making, is the cornerstone of sound governmental policy in this area. *See Riggs v. Township of Long Beach,* 109 *N.J.* 601, 619–22 (1988) (Handler, J., concurring). Thus in *PRB Enterprises, Inc. v. South Brunswick Planning Board,* 105 *N.J.* 1, 9 (1987), we invalidated "imprecise" delegations of the zoning power under "conditional use" ordinances. In this case, however, we are satisfied with the balancing decision performed by the Board. Its decision to grant Paschal's application on the grounds that it provided a more aesthetic environment was not unreasonable, arbitrary, or capricious.

That conclusion finds support in both the nature of Paschal's commercial activity and the nature of the premises as envisioned after the grant of a variance. Defendant owns a small business on a one-acre plot. Although a 10,300–square–foot expansion is large in relation to the total size of the property, it is a minor expansion when compared to the benefit conferred on the community as a whole. Moreover, the enlarged area is designed for storage only. The use variance does not permit defendant to perform some new service alien to the pre-existing nonconforming use, such as crushing automobiles. Although Paschal testified at the board hearings that he would be able to store more autos in the new storage area, he also stated that the increased storage capacity would not increase his business or change his output. Thus the variance results in expansion of one of the more benign uses of the property; and in exchange the more offensive aspects of the applicant's auto-salvage and

repair business have been taken off the front street, away from public view and restricted to the confines of the storage area. The Board concluded that the aesthetic benefits gained by Paschal's relinquishment of 3,700 square feet of the nonconforming use was worth the expansion of 10,300 square feet. That is precisely the kind of balancing decision that is best left to the sound judgment of local officials.

A note of caution, however, is in order. We note, as did the Court in *Kohl v. Mayor of Fair Lawn, supra,* 50 *N.J.* 268, that aesthetic benefits alone will not always justify a substantial expansion of a pre-existing nonconforming use. For instance, in *Pieretti v. Mayor of Bloomfield, supra,* 35 *N.J.* 382, plaintiffs sought to expand a beverage-bottling plant, which they operated as a nonconforming commercial use on two tracts of land zoned for combination residential and industrial use. *Id.* at 385–86. The plant was located in a section of the zone that was largely residential. The plaintiffs sought a variance to enlarge the existing facility from about 7,000 square feet to 18,500 square feet, and to expand an underground water-filtration system. The plan also called for parking areas to accommodate visitors and thirty-two employees, and proposed landscaping in the west and a stucco facade on the side of the addition facing the neighbors to the east. The zoning board concluded that the proposed addition would improve the neighborhood's appearance by enclosing various "unsightly" activities of the bottling operation that were conducted in the open. As an alternative basis for its holding to reverse the variance grant, this Court concluded that "plaintiffs have not established 'special reasons' for obtaining a variance." *Id.* at 389.

Our holding in the instant case does not conflict with the alternative holding in *Pieretti.* The proposed expansion in that case was much greater and the aesthetic benefits to be gained were much less than in Paschal's application. *See also Monmouth Lumber Co. v. Ocean Township,* 9 *N.J.* 64 (1952) (not an abuse of discretion for governing body to deny variance application to build thirty-by-sixty-foot garage to house vehicles for

pre-existing nonconforming commercial use in residentially-zoned area, given rapid growth in residential quality of community); *Wajdengart v. Broadway–Thirty–Third Corp.*, 66 *N.J. Super.* 346 (App.Div.1961) (reversing grant of a variance to permit offstreet parking in residential zone); *Suesserman v. Board of Adjustment of Newark*, 61 *N.J.Super.* 28 (App.Div. 1960) (reversing grant of variance to create parking lot for catering establishment in residential zone); *Mocco v. Job*, 56 *N.J.Super.* 468 (App.Div.1959) (reversing grant of variance to permit second floor of tavern to be used for dancing); *Whitehead v. Zoning Bd. of Adjustment of Kearny*, 51 *N.J.Super.* 560 (App.Div.1958) (reversing grant of variance to permit construction of swimming pool to supplement private-tennis-club facilities).

■ Moreover, we emphasize that although concerns of appearance and compatibility have particular relevance in the context of variance applications to expand a pre-existing nonconforming use, they have less relevance compared to the other basic concerns of the MLUL when the question is whether to allow a new use that does not conform to the existing zoning ordinance. In respect of a variance to permit a "new" nonconforming use, ambience alone can seldom be a proper basis for special reasons. Favorable consideration is appropriate in those cases only if the variance inherently serves the public good, *DeSimone v. Greater Englewood Housing Corp. # 1*, 56 *N.J.* 428 (1970) (public or semi-public low-cost-housing project in one-family residential zone); *Burton v. Town of Montclair*, 40 *N.J.* 1 (1963) (private school in residential zone); *Andrews v. Board of Adjustment, Ocean Township, supra*, 30 *N.J.* 245 (variance granted to permit parochial school on residentially-zoned premises); *Yahnel v. Board of Adjustment of Jamesburg, supra*, 79 *N.J.Super.* 509 (telephone-equipment building in residential zone); or where the nonconforming use is particularly suited to the property, *cf. Fobe Assocs. v. Mayor of Demarest, supra*, 74 *N.J.* 519 (denial of variance application to construct garden apartments in single-family residence district);

or where the property is not reasonably adapted to a conforming use, *see Medici v. BPR Co., supra,* 107 *N.J.* at 17 n. 9.

Obviously, cases in which the variance would create an entirely new nonconforming use require greater proof to demonstrate the merits of such a variance than do cases in which the applicant seeks only a minor expansion of a pre-existing nonconforming use. Although an expansion of a pre-existing nonconforming use can be granted either where the use inherently serves the public good, as in *Black v. Town of Montclair,* 34 *N.J.* 105 (1961) (addition to parochial school in residential zone), or where the land is particularly suited only for that nonconforming use, *Kramer v. Board of Adjustment, Sea Girt, supra,* 45 *N.J.* 268, such an expansion, when minor, can be based as well on other considerations such as aesthetics.

–B–

As a second special reason the Board found that the recycling activities inherent in Paschal's auto-salvage business provided a public benefit. We agree with the Appellate Division's rejection of that ground for the Board's decision. Our disagreement with the Board's conclusion in that respect does not, however, change our ultimate holding that the Board could nevertheless have found special reasons, because "the question is whether the special reasons, *taken as a whole,* are founded affirmatively in one or more of the zoning objectives set forth in [the statute]." *Kramer v. Board of Adjustment, Sea Girt, supra,* 45 *N.J.* at 287. Moreover, "it is in nowise controlling that one or more of the reasons standing alone would not be legally sufficient." *Ward v. Scott,* 16 *N.J.* 16, 21 (1954). Because we have concluded that aesthetics was the predominate reason for granting the variance and that the Board did not act arbitrarily or capriciously in finding that the aesthetic benefits presented could constitute a special reason, it is not necessary to our holding that we address the issue of whether the general recycling benefits gained in Paschal's operation can be con-

sidered a special reason. We discuss that issue only for purposes of guidance.

As stated above, when a nonconforming use inherently serves the public good, a special reason exists. The example is the use of residentially-zoned premises for a parochial school, as in *Andrews v. Board of Adjustment, Ocean Township, supra*, 30 *N.J.* 245. The Court found it indisputable that the education of children furthered the general welfare and that a need existed for additional parochial schools within the community. *Id.* at 251. But two cases, *Kohl v. Mayor of Fair Lawn, supra*, 50 *N.J.* 268, and *Medici v. BPR Co., supra*, 107 *N.J.* 1, show that a court would be most hesitant to find that a commercial use such as an automobile-salvage yard inherently promotes the general welfare.

In addition to the incidental aesthetic benefits referred to above, the applicant in *Kohl* argued that inasmuch as the processing and bottling of milk itself served the general welfare of the community, a special reason existed to justify the grant of a variance for a half-million-dollar expansion of its nonconforming bottling facility. 50 *N.J.* at 279. This Court disagreed, pointing out that when the use is not of the type that inherently provides special reasons, such as a school or hospital, it must be demonstrated that "the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought." *Ibid.*

The principle that for a nonconforming commercial use to be beneficial to the general welfare it must be specifically and peculiarly suited to the site in question was recently reaffirmed in *Medici v. BPR Co., supra*, 107 *N.J.* 1. The proposed use in *Medici* was a four-story motel in a borough that did not permit motels or hotels in any zoning district. The Appellate Division concluded that "it was neither arbitrary, capricious, [n]or unreasonable for the Board to have determined that there was a 'public need' for a motel in the area and that the site, because of its shape and its proximity to highways and commercial

development, was 'particularly suitable' for use as a motel."
*Id.* at 8–9. This Court reversed, disagreeing particularly with
"the conclusion of the board that 'the need for good motel
accommodations' constitute[ed] a special reason sufficient to
sustain [the] variance." *Id.* at 24.

In *Medici* the principle of *Kohl* was articulated in the form of
a general rule:

> Although certain commercial uses may inherently serve the general welfare in
> a particular community, the typical commercial use can be better described as a
> convenience to its patrons than as an inherent benefit to the general welfare.
> For such uses, any benefit to the general welfare derives not from the use itself
> but from the development of a site in the community that is particularly
> appropriate for that very enterprise. [*Id.* at 18.]

Unlike a school or hospital, the business of recycling
auto parts does not inherently serve the public good. Thus,
under the rule set out in *Kohl* and reaffirmed in *Medici,* the
Board could have found that Paschal's nonconforming commer-
cial use served the general public welfare only if Paschal
proved that the proposed expansion is particularly suited to the
Thomastown Road location. There was no showing here that
the public benefit derived from the recycling of auto parts could
be gained only through an expansion of the applicant's storage
area, nor was there evidence demonstrating that the community
was dependent on Paschal for its supply of recycled auto parts
or for its disposal of automobiles. That kind of proof is
necessary to support a finding that the recycling benefits of an
auto-salvage business enhance the general welfare. We note,
as did the Court in *Kohl,* that

> [o]f course, the owner of a nonconforming use, like any other property owner,
> may be granted a variance in a proper case. In passing on such an application
> the governing body may consider the fact that a nonconforming use already
> exists on the premises and it is not necessary for an applicant to show that the
> variance properly could have been granted to create the nonconforming use in
> the first instance. This advantage enjoyed by the owner of a nonconforming
> use over an applicant for a variance to create a new nonconforming use is not
> absolute, however, and the mere existence of a nonconforming use does not of
> itself give rise to special reasons entitling the owner to a variance for the
> enlargement of the use. [50 *N.J.* at 281–82 (citations omitted).]

The facts of this case do not support a conclusion that benefits to the general welfare of Paschal's operation as a recycling center sufficiently constitute a "special reason" under the MLUL.

–C–

Having concluded that the Board's finding that special reasons existed was not arbitrary or capricious, we next consider whether the Paschal application can satisfy the negative criteria of the "d" variance. In *Ward v. Scott*, 11 *N.J.* 117 (1952), this Court first noted that application of the standard under *N.J.S.A.* 40:55–39d—that a variance could be granted "[i]n particular cases and for special reasons"—was subject to an overarching restriction:

> Above all, there is the fixed and far reaching protective restriction in the concluding provision * * * against allowance of the variance unless it can be granted "without substantial detriment to the public good and will not substantially impair the intent and purpose of the zoning plan and zoning ordinance." [*Id.* at 126.]

Thus, a zoning board must find not only that special reasons exist but also that a variance application satisfies these negative criteria.

In *Kramer v. Board of Adjustment, Sea Girt, supra,* 45 *N.J.* at 292–93, the Court held that the negative criteria could be satisfied if the proposed structure compared favorably with the existing structure. The applicant in that case applied for a variance to replace a dilapidated seaside hotel with a modern "year-round" structure. Although there was evidence that the new hotel would result in "greater intensification of the commercial use," the board found that the negative criteria were satisfied because the new hotel would be smaller in dimension, have fewer guest rooms, provide adequate parking facilities, and be fireproof. This Court found that the board's decision was not arbitrary or capricious.

In the case before us the Board made a comparison similar to that of the board in *Kramer.* The Board found that Paschal's proposal would "render the [nonconforming] use more in char-

acter with the surrounding residential use," "improve the aesthetic character of the property," allow better control of the use of the property, "increase the recycling function of the property," and improve the traffic flow. The Board further noted that the plaintiffs presented no testimony in opposition to the proposal. The findings of the Board are of the same nature and quality as those that this Court deemed sufficient in *Kramer*. We cannot say that the Board acted arbitrarily or capriciously in finding the negative criteria satisfied on the facts presented.

We are mindful of *Medici's* "[n]arrow[ing] to some extent the discretion boards of adjustment have in reviewing use-variance appeals * * *." 107 *N.J.* at 5. The change in *Medici* was made to keep the standard of review in step with the amendments that the legislature had made to the zoning laws over the years. *Id.* at 23. The additional burden calls for "an enhanced quality of proof and clear and specific findings by the board of adjustment that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." *Id.* at 21. More specifically, the Court stated:

> The applicant's proofs and the board's findings that the variance will not "substantially impair the intent and purpose of the zone plan and zoning ordinance," *N.J.S.A.* 40:55D-70(d), must reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the zoning district
>
> * * * * * * * *
>
> The board's resolution should contain sufficient findings, based on the proofs submitted, to satisfy a reviewing court that the board has analyzed the master plan and zoning ordinance, and determined that the governing body's prohibition of the proposed use is not incompatible with a grant of the variance. [*Id.* at 21-23.]

In this case the Board made no attempt to make any findings regarding the enhanced proof of the negative criteria now required under *Medici*. That is understandable, given that the variance was granted in 1985 and our *Medici* decision was handed down in 1987. Nevertheless, *Medici* emphasized the requirement that a proposed variance be reconciled with the

zoning ordinance's failure to include in the ordinance's permitted uses the one sought by the variance. Clearly, *Medici's* enhanced-proof requirement focused on variances for new uses rather than on expansions of existing uses. In our view the record in this case amply sustained the Board of Adjustment's conclusion that the grant of the proposed variance, in the context of the conditions imposed by the Board, would further "the purposes and intent of the * * * Township zoning ordinance * * * by virtue of elimination of some of the conditions which now exist on the property in question." We are convinced that the record supports the Board's determination that the applicant's proofs satisfied the negative criteria.

The judgment of the Appellate Division is reversed. The cause is remanded to the Law Division for reinstatement of the judgment upholding the grant of a variance.

O'HERN, J., dissenting.

While I agree generally with the well-reasoned opinion of the majority that the standard for granting a variance to expand a nonconforming use may be seen as somewhere between the traditional standards of "hardship" on the one hand and "special reasons" on the other, I believe that more content should be given to the standard.

We have repeatedly emphasized that a necessary concomitant of the increased power conferred on zoning boards by the Municipal Land Use Law (MLUL), *L.* 1975, *c.* 291, *N.J.S.A.* 40:55D-1 to -112, not just to *recommend* but to *grant* use variances, *N.J.S.A.* 40:55D-70d, is an exacting requirement for the development of standards. *See Medici v. BPR Co.*, 107 *N.J.* 1, 19-22 (1987). As the majority correctly notes, we have always emphasized that "[p]lanning, not *ad hoc* decision-making, is the cornerstone of sound governmental policy in this area," *ante* at 390, thus inveighing against "imprecise" delegations of the zoning power.

The reasons are obvious. The zoning power is too important to be left to *ad hoc* judgment. Hence we must give more precise content to a grant of permission to expand a nonconforming use than that it serves the purpose of "aesthetics," albeit admittedly that is one of the recognized purposes of zoning. One man's work of art may be another man's eyesore. In addition, common experience tells us that in most instances the nonconforming users will be long-standing members of a community. It asks a good deal of local land use officials to deny such a request when their discretion is so great.

What content then can we give to the standard? I believe that guidance may be drawn from the analogous but less intrusive "c(2)" dimensional variance. *N.J.S.A.* 40:55D–70c(2); *see Kaufmann v. Planning Bd. for Township of Warren,* 110 *N.J.* 551 (1988). At a minimum, we should expect that the expansion of a nonconforming use would advance the purposes of zoning and lessen, not increase, the intrusion on the zoning plan. An easy illustration would be when a small structural addition to the dimensions of a nonconforming use would be accompanied by an improved site plan and by an overall reduction in the intensity of the use. Such a variance would result in less, not more, intrusion. Like the c(2) variance, the variance for expansion should be seen to advance not the purposes of the owner, but rather the purposes of the zone plan. Generally, a greater intensity of use, as here, would run afoul of the principle. Hence, I would, at a minimum, require a remand to the local board to reconsider the matter. Obviously, as the majority notes, the zoning board erred when it concluded that an auto-salvage operation inherently served the public good.

Obviously, too, this case marks the beginning, not the end, of the development of the standard for expansion of a nonconforming use under the MLUL. *N.J.S.A.* 40:55D–70d. We have emphasized that this process of definition evolves on a case-by-case basis. *See Medici v. BPR Co., supra,* 107 *N.J.* 1 (tracing history of standards applied in use variance cases when adding to the pre-MLUL requirements the requisites of enhanced proof

and specific findings on negative criteria). The process will serve us as well here.

*For remandment*—Justices O'HERN and GARIBALDI—2.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK and STEIN—5.