991 A.2d 866 (2010)
412 N.J. Super. 541
Mena SAADALA, Plaintiff-Appellant,
v.
EAST BRUNSWICK ZONING BOARD OF ADJUSTMENT and 7-Eleven, Inc., Defendants-Respondents.
No. A-4999-08T1
Superior Court of New Jersey, Appellate Division.
Argued February 9, 2010.
Decided April 22, 2010.
*867 Edward F. Liston, Jr., Toms River, argued the cause for appellant.
James A. Tarella, North Brunswick, argued the cause for respondent East Brunswick Zoning Board of Adjustment (Tarella & Liftman, attorneys; Mr. Tarella, of counsel and on the brief).
Peter H. Klouser, Millstone Township, argued the cause for respondent 7-Eleven, Inc. (Heilbrunn, Pape & Goldstein, attorneys; Kenneth L. Pape, of counsel; Jeffrey Zajac, on the brief).
Before Judges SKILLMAN, FUENTES and GILROY.
The opinion of the court was delivered by SKILLMAN, P.J.A.D.
This appeal requires us to determine whether an application for a use variance for establishment of a combined convenience store and retail gasoline station, to replace two separate nonconforming uses for a convenience store and gasoline station, constitutes an expansion of a nonconforming use, which is subject to the more liberal standards for a use variance set forth in Burbridge v. Township of Mine Hill, 117 N.J. 376, 568 A.2d 527 (1990), rather than the restrictive standards applicable to a use variance for creation of a new use set forth in Medici v. BPR Co., 107 N.J. 1, 526 A.2d 109 (1987). We conclude that such a redevelopment plan constitutes the creation of a new use, which is subject to the Medici standards, and that those standards were not satisfied in this case.
The issue is presented by an appeal from a final judgment of the Law Division, which affirmed a resolution by the East Brunswick Zoning Board of Adjustment granting the land use approvals required for defendant 7-Eleven to redevelop and expand a site upon which it currently operates a convenience store to add the retail sale of gasoline to its business operation. The lot upon which 7-Eleven operates the convenience store is less than one-half acre in size. The store consists of 2,650 square feet of floor space. There are six parking spaces on the site. Part of the store is located in a residential zone in which convenience stores are not a permitted use. However, the store was constructed before adoption of the zoning ordinance prohibiting this use. Therefore, it is a legal, preexisting nonconforming use.
For a substantial number of years, a Shell gasoline station operated on a corner lot immediately adjacent to the site of the 7-Eleven. The station had four gasoline pumps located close to the road that provided eight fueling positions. The station also had a 1,280 foot service building, with two service bays, for servicing and repairing cars. The Shell station was located in a commercial zone in which gasoline stations are not a permitted use. Like the 7-Eleven store, the Shell station was established before adoption of the zoning ordinance that made it a prohibited use. Therefore, the Shell station was also a legal, preexisting nonconforming use.
Sometime in early 2007, Middlesex County and East Brunswick condemned strips of land on both the 7-Eleven and Shell station lots for the purpose of widening the intersection at which the businesses were located.[1] This acquisition apparently rendered the gas pumps at the Shell station unusable, and around March 2007, Shell closed its station and removed the pumps.
*868 Thereafter, 7-Eleven developed plans to expand its site and add the retail sale of gasoline to its existing convenience store business. To this end, it contracted to buy the former site of the Shell station from the Caggiano family, which had leased the site to Shell. 7-Eleven also contracted to buy another adjoining lot owned by the Caggianos, which is a vacant, wooded area not formerly used in the operation of either the 7-Eleven or the Shell station. This lot is located in a residential zone. 7-Eleven proposes to construct three new gasoline pump islands, with six fueling positions, which would be set back substantially further from the road than the pumps at the former Shell station, and to construct an eighty by twenty-foot canopy over the gas pumps and a kiosk under the canopy for the use of the gas attendants. 7-Eleven also proposes to remove the service building formerly used by Shell and to increase the number of parking spaces on the site from six to seventeen.
7-Eleven's application to the Board of Adjustment requested use variances for both the "[e]xisting convenience store" and the "[p]roposed gasoline service station," bulk variances, exceptions from certain design standards, and site plan approval. 7-Eleven presented its request as an application for "an expansion of the existing nonconforming use" within the intent of N.J.S.A. 40:55D-70(d)(2).
The Zoning Board granted 7-Eleven's application. The Board found, in conclusionary language, that "[7-Eleven's] witnesses presented reasoned testimony supporting [7-Eleven's] proposed uses which are particularly suited to and peculiarly situated in an area where numerous commercial uses are located." The Board also stated that "[t]he premises in question are existing commercial uses in appropriate locations" and that the grant of a use variance would "promot[e] a more desirable visual environment by redevelopment of a site that has declined for a number of years."
Plaintiff, an East Brunswick property owner, brought this action in lieu of prerogative writs challenging the Board's grant of a use variance that would allow 7-Eleven to construct the improvements required for a combined convenience store and retail gasoline station, commonly referred to as a mini-mart. After oral argument, the trial court issued a written opinion affirming the Board's grant of the use variance for 7-Eleven's proposed facility. Although the Zoning Board described the former Shell station as "abandoned," the court concluded that there had not been an "abandonment" of the nonconforming use as a gasoline station because "the owner of the gasoline service station property intend[ed] to sell it to 7-11 for the same use that preexisted the cessation of operation by Shell." The court also concluded that "two independent, nonconforming uses exist" on the site, which would be "consolidated into a single use" under 7-Eleven's redevelopment proposal. For this reason, the court concluded that 7-Eleven's application was for "an expansion of one nonconforming use," which was governed by N.J.S.A. 40:55D-70(d)(2) rather than N.J.S.A. 40:55D-70(d)(1). Under this view, the court concluded that the Board's finding of "special reasons" for approval of the application was adequately supported by the record.
Since the Zoning Board granted 7-Eleven's application on the theory that its redevelopment plan involves an expansion of a nonconforming use or uses, and the trial court affirmed the Board on this same basis, we first consider the law governing the continuation of nonconforming uses. The statutory authorization for such continuation is provided by N.J.S.A. 40:55D-68, which states:

*869 Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the structure so occupied and any such structure may be restored or repaired in the event of partial destruction thereof.
In construing N.J.S.A. 40:55D-68, our courts have held that "[b]ecause nonconforming uses are inconsistent with the objectives of uniform zoning, ... they should be reduced to conformity as quickly as is compatible with justice." Town of Belleville v. Parrillo's, Inc., 83 N.J. 309, 315, 416 A.2d 388 (1980). "The method generally used to limit nonconforming uses is to prevent any increase or change in the nonconformity." Id. at 316, 416 A.2d 388. "Under that restrictive view our courts have held that an existing nonconforming use will be permitted to continue only if it is a continuance of substantially the same kind of use as that to which the premises were devoted at the time of the passage of the zoning ordinance." Ibid.
7-Eleven recognized that its proposed redevelopment of its site as a mini-mart did not involve simply a continuation of its prior use as a convenience store and consequently that a use variance would be required. However, 7-Eleven took the position, which both the Zoning Board and trial court accepted, that both its convenience store and the former Shell gas station were preexisting nonconforming uses, which could be combined into a single use, and therefore, its application was for expansion of an existing nonconforming use rather than the creation of a new use. Under this theory, 7-Eleven's application would be subject to review under the more liberal standards applicable to the grant of a use variance for expansion of a nonconforming use set forth in Burbridge, supra, 117 N.J. at 386-93, 568 A.2d 527, rather than the restrictive standards applicable to the grant of a use variance for creation of a new use set forth in Medici, supra, 107 N.J. at 17-18, 21-22, 526 A.2d 109.
It is undisputed that the 7-Eleven convenience store is a legal, preexisting nonconforming use. In addition, even though Shell's removal of the gasoline pumps used in the operation of its business could be viewed as the destruction of the structure constituting the nonconforming use, which would have terminated that use, see Avalon Home & Land Owners Assoc. v. Borough of Avalon, 111 N.J. 205, 211-12, 543 A.2d 950 (1988),[2] we assume the Shell gasoline station was also a legal, preexisting nonconforming use when 7-Eleven applied to the Zoning Board for the use variance required for its proposed new mini-mart. However, we conclude that 7-Eleven's proposed redevelopment of the site did not constitute a continuation of those preexisting uses, but rather a new use, which required 7-Eleven to satisfy the Medici standards for the grant of a use variance.
In Burbridge, the Court held that in considering an application for a use variance for expansion of a nonconforming use, a board of adjustment should take a more liberal approach in determining both whether "special reasons" exist for the variance, 117 N.J. at 386-93, 568 A.2d 527, and whether the variance "can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance," id. at 384, 396-98, 568 A.2d 527. However, the Court did not have occasion to decide what constitutes an *870 "expansion of a nonconforming use" within the intent of N.J.S.A. 40:55D-70(d)(2), rather than the establishment of a new use under N.J.S.A. 40:55D-70(d)(1), because it was undisputed that the use variance application in Burbridge was for expansion of a nonconforming use. See id. at 378, 568 A.2d 527. Moreover, the Court has not addressed this issue since Burbridge.
Although the Court has not directly addressed the meaning of "expansion of a nonconforming use" under N.J.S.A. 40:55D-70(d)(2), which results in review of a use variance application under the more liberal standards set forth in Burbridge, its decisions dealing with the continuation of nonconforming uses indicate that this phrase should be construed restrictively. In Parrillo's, the Court distinguished between an "enlargement" and a "change" in a nonconforming use and stated that in determining whether a "change" in use was "substantial," our "[c]ourts ... have proceeded with a caution approaching suspicion." 83 N.J. at 316, 416 A.2d 388. Most significantly, the Court stated that "an existing nonconforming use will be permitted to continue only if it is a continuance of substantially the same kind of use as that to which the premises were devoted at the time of the passage of the zoning ordinance." Ibid. This comment at least suggests that the Court would take a restrictive view of what constitutes an expansion of a preexisting nonconforming use rather than the establishment of a new use.
The discussion of the expansion of nonconforming uses in Burbridge also supports this conclusion. For example, the Court stated:
When the application before a board is to expand a nonconforming use, the competing considerations are clear: if the variance is denied, the hope is that the nonconforming use will wither and die; on the other hand, as long as the nonconforming use exists and is thriving, the Board obviously would want to make it conform as best it could with the current use-designation in the zone.
[117 N.J. at 388, 568 A.2d 527.]
When a landowner proposes to make a substantial change in a nonconforming use, such as the change from use as a restaurant to use as a discotheque involved in Parrillo's, the application to authorize this change often will be made because the existing use is no longer physically or economically viable and thus is not "thriving." In such circumstances, there is a greater likelihood that "the nonconforming use will wither and die" if the application is denied than where an applicant only seeks authorization for expansion of an existing use. Consequently, there are substantial policy reasons, which the Court appears to have implicitly recognized in Parrillo's and Burbridge, for not applying the liberalized standards set forth in Burbridge in reviewing an application seeking authorization for a substantial change in use.
Under 7-Eleven's redevelopment plan, what was formerly a nonconforming convenience store on one lot and a nonconforming gasoline station on another lot would be replaced by an integrated nonconforming business operating on both lots as well as a third lot not formerly used for any nonconforming business operation.[3] The establishment of this new business operation would involve the construction of three new islands for the dispensing of gasoline, on which three new gasoline pumps and a kiosk would be erected, and *871 the creation of eleven new parking spaces. Therefore, we conclude that 7-Eleven's plan for the establishment of a mini-mart, which would add the retail sale of gasoline to its current operation of a convenience store, would not involve simply an expansion of the convenience store or the former Shell gas station but rather a substantial change in the use of the properties.
If there could be any doubt that 7-Eleven's proposed mini-mart should be considered a new use rather than simply an expansion of the existing nonconforming uses, it would be dispelled by the East Brunswick zoning ordinance, which treats "gas stations mini-marts" as a different category of permitted use than either a convenience store or gasoline station. This ordinance provides that one of the permitted uses in the C-2 zone, in which part of the 7-Eleven store and all of the former Shell station site are located, is "[a] single freestanding retail ... establishment which supplies commodities ... primarily for residents of the surrounding neighborhood, such as [a] grocery store," which the parties agree would include a 7-Eleven convenience store.[4] This ordinance also provides that one of the specifically prohibited uses in the C-2 zone is "gasoline sales[,]" which the parties agree would include Shell's prior nonconforming use of the site for a gasoline station. Although the zoning ordinance does not list a "mini-mart" as either a permitted or specifically prohibited use in the C-2 zone, the sections of the ordinance governing uses in the HC-2 zone provide that not only "gas stations" but also "gas stations mini-marts" are conditionally permitted uses. In short, the East Brunswick zoning ordinance recognizes that a "mini-mart" is a different type of business operation than either "a single freestanding retail ... establishment... such as a grocery store," or "gasoline sales," thus reinforcing our conclusion that the proposed 7-Eleven mini-mart should be considered a new use, which could be authorized only by a use variance under N.J.S.A. 40:55D-70d(1) that would be subject to the restrictive standards set forth in Medici.
Those restrictive standards apply both to the positive ("special reasons"), 107 N.J. at 17-18, 526 A.2d 109, and negative (that the variance "can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance"), id. at 21-22, 526 A.2d 109, criteria for the grant of a use variance. We conclude that 7-Eleven failed to establish the positive criteria of "special reasons" for a use variance for its proposed new mini-mart. Consequently, we have no need to consider whether 7-Eleven's proofs could be found to have established the negative criteria under the "enhanced quality of proof" required by Medici. Id. at 21, 526 A.2d 109.
In both Medici, 107 N.J. at 18, 526 A.2d 109, and Burbridge, 117 N.J. at 385, 568 A.2d 527, the Court reaffirmed the principle stated in Kohl v. Mayor of Fair Lawn, 50 N.J. 268, 275, 234 A.2d 385 (1967), that "[v]ariances to allow new nonconforming uses should be granted only sparingly and with great caution since they tend to impair sound zoning." The Court in Medici explained the reason for taking this restrictive view of the requirement of special reasons for granting a variance to allow a new nonconforming use:
Although certain commercial uses may inherently serve the general welfare in a particular community, the typical commercial use can be better described as a *872 convenience to its patrons than as an inherent benefit to the general welfare. For such uses, any benefit to the general welfare derives not from the use itself but from the development of a site in the community that is particularly appropriate for that very enterprise.
[107 N.J. at 18, 526 A.2d 109.]
In Stop & Shop Supermarket Company v. Board of Adjustment of Springfield, 162 N.J. 418, 431, 744 A.2d 1169 (2000), the Court held that when a property owner applies for a use variance for a commercial use that is not inherently beneficial,
the required proof of special reasons focuses exclusively on the special characteristics of the property and imposes on the applicant the burden of establishing either that the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought, or that undue hardship exists because the property for which the use variance is sought cannot reasonably be adapted to a conforming use. [Internal citations and quotation marks omitted.]
The Zoning Board did not find that "undue hardship exists" because the 7-Eleven property "cannot reasonably be adapted to a conforming use." Moreover, the evidence presented to the Board would not support such a finding. 7-Eleven's current operation of a convenience store is a "conforming use" on the part of its property located in the C-2 zone and a protected nonconforming use in the part of its property located in the residential zone. If required to properly serve its customers, 7-Eleven could apply for a use variance under N.J.S.A. 40:55D-70(d)(2) to expand and modernize its store, including whatever construction may be needed for additional parking spaces. And if 7-Eleven does not choose to expand, the part of its property located in the C-2 zone that is not required for the convenience store presumably could be put to another productive, permitted commercial use. Consequently, 7-Eleven has not shown that the grant of a use variance to allow the establishment of a mini-mart is required to avoid "undue hardship."
Although the Board stated in its resolution approving 7-Eleven's application that "[7-Eleven's] proposed uses ... are particularly suited to and peculiarly situated in an area where numerous commercial uses are located," this statement is totally conclusionary and lacks evidential support in the record. 7-Eleven has not shown that there is anything about its property that makes it "peculiarly fitted" for a mini-mart. Indeed, as previously discussed, the East Brunswick zoning ordinance expressly permits this type of commercial use in another zoning district.
Therefore, 7-Eleven failed to make the showing of "special reasons" required for approval of a use variance for its redevelopment plan.
Accordingly, the judgment of the Law Division is reversed.
NOTES
[1] Although the record does not indicate the extent of land condemned for this highway improvement project, 7-Eleven's counsel described the acquisitions in oral argument before the Law Division as "very substantial."
[2] We note in this respect that 7-Eleven proposes to construct an entirely new facility for the dispensing of gasoline, which would be located significantly further from the roadway than the Shell gas pumps, and to erect a new canopy and kiosk for protection of the gasoline attendants from the elements.
[3] It appears from the exhibits introduced into evidence at the hearing before the Board that one of the new islands for dispensing gasoline, a gas pump, three canopy lights, and five new parking spaces would be located on this lot, which is currently vacant.
[4] The 7-Eleven store is considered a nonconforming use only because it is located partly in a residential zone in which such a retail store is not a permitted use.