971 A.2d 449 (2009)
407 N.J. Super. 404
FRIENDS OF PEAPACK-GLADSTONE, Plaintiff-Appellant,
v.
BOROUGH OF PEAPACK-GLADSTONE LAND USE BOARD; The Mayor and Council of the Borough of Peapack-Gladstone; HF Cottages, L.L.C.; and HF Development, L.L.C., Defendants-Respondents.
No. A-4668-07T3
Superior Court of New Jersey, Appellate Division.
Argued March 30, 2009.
Decided June 10, 2009.
*450 Nicole Bearce Albano argued the cause for appellant (Lowenstein Sandler, PC, attorneys; Ms. Albano, of counsel and on the brief; David M. Reiner, Roseland, on the brief).
Edward J. Trawinski, Clifton, argued the cause for respondent Borough of Peapack-Gladstone (Schenck, Price, Smith & King, LLP, attorneys, join in the brief of respondents HF Cottages, LLC, and HF Development, LLC).
Sharon H. Moore argued the cause for respondents Mayor and Council of the Borough of Peapack-Gladstone (Gebhardt & Kiefer, attorneys, join in the brief of respondents HF Cottages, LLC, and HF Development, LLC).
Christopher John Stracco argued the cause for respondents HF Cottages, LLC, and HF Development, LLC (Day Pitney, LLP, attorneys; Mr. Stracco and Jennifer Gorga Capone, on the brief).
Before Judges R.B. COLEMAN, SABATINO and SIMONELLI.
The opinion of the court was delivered by
SABATINO, J.A.D.
This is an appeal of a settlement entered into between a real estate developer and a local land use board. The settlement was approved by the trial court following a hearing before the board consistent with Whispering Woods at Bamm *451 Hollow, Inc. v. Twp. of Middletown Planning Bd., 220 N.J.Super. 161, 531 A.2d 770 (Law Div.1987). Appellants, a coalition of local residents who object to the proposed development, challenge the settlement as procedurally and substantively flawed. They principally contend that the developer was improperly allowed through the settlement to circumvent current density requirements for its property, and that the matter must be remanded to reconsider the propriety of density variances. We affirm.

I.
The land use application involved in this litigation has an intricate history dating back more than a decade. We summarize the events most relevant to our consideration of the legal issues raised on appeal.
Defendants, HF Cottage, LLC, and HF Development, LLC (collectively, "HFGC" or "the developer"), are the owners of 73.25 acres of real property located in the Borough of Peapack-Gladstone ("the Borough"), east of Fowler Road, near where that road intersects with Brady Road. The property is designated as Block 33, Lots 13.05 through 13.18, and Lots 13.20 through 13.23, on the Borough's tax map. The property, which was at one time part of a larger 179.67 acre tract, is adjacent to Hamilton Farms Golf Club, a private golf club.
In 1998, HFGC's predecessor in interest, Peapack DG Properties, LLC ("DG"), applied to the Borough's Land Use Board ("the Board") for preliminary major site plan, subdivision, and general developmental approval for the original 179.67 acre tract. In particular, DG sought approval to build eighteen golf cottages on the site, which would be developed for use as corporate accommodations. At the time, the pertinent zoning ordinance (for the then-existing Zone R-2A) would have permitted thirty-four single-family residences on the property. DG proposed that the remaining 33.78 acres would be preserved as open space.
On February 3, 1999, the Board acted on DG's application. The Board approved construction of the eighteen corporate cottages, with the significant proviso that the cottages would be used for meetings and overnight accommodations by members of the golf club and their guests, and would not be used as single-family residences. The Board also granted DG preliminary site plan and subdivision approval, specifying in its resolution that the property would have ten years of prospective land use protection for the development of the cottages.
Thereafter, on September 27, 2001, HFGC, as DG's successor in interest, filed an application with the Board for final major subdivision approval. After a hearing on November 7, 2001, the Board approved that application, and a memorializing resolution was adopted on December 5, 2001. Title to the property was conveyed by DG to HFGC the day after the hearing. In issuing this final approval, the Board reaffirmed its earlier condition that none of the cottages would be used as principal residences. Given that requirement, HFGC recorded a Declaration of Restrictive Covenant, dated March 21, 2002, which provided that "in no event shall any [cottage] be used by anyone as a principal residence."
Subsequently, HFGC discovered that eleven of the proposed lots approved for development were physically located outside of the Borough's sewer district. Accordingly, in early 2002, HFGC applied for amended preliminary site plan and subdivision approvals to construct the cottages in two phases: Phase One, relating to the portion of the property located within the sewer district, which would include seven *452 cottages; and Phase Two, which would include the eleven remaining lots located outside of the sewer district. On June 19, 2002, the Board granted these amended approvals, authorizing the project to be developed in the two Phases.
In February 2003, HFGC applied to the Board for final major subdivision approval for Phase One. During the hearing on that application, HFGC's representatives reassured the Board that the cottages would essentially "end up being second homes... but [] not principal residences[.]" Following that hearing, on April 16, 2003, the Board adopted a resolution granting the requested approvals for Phase One.
On May 24, 2004, HFGC filed an application with the Board for final major subdivision approval for Phase Two. The Board likewise granted that application for Phase Two, memorializing the approval in a resolution dated July 21, 2004. Following these approvals covering both Phase One and Phase Two, a final major subdivision map depicting the property with eighteen lots was duly recorded with the Somerset County Clerk on October 8, 2004.
Several months later, on March 2, 2005, HFGC filed an application with the Board requesting a change in the anticipated use of the structures. Specifically, HFGC sought to remove the restrictions against primary residential use for the cottages. Instead, HFGC sought to have the Board allow primary residential uses on an age-restricted basis, as permitted in the R-2A zone. After HFGC became aware of neighbors' opposition to the proposed use change, that particular application was withdrawn.
On January 12, 2006, the Borough's zoning official issued a construction permit for Lot 13.06 for the building of the first cottage in Phase One. About three weeks later, the developer obtained an $8 million construction loan to begin construction of Phase One.
Thereafter, on February 2, 2006, HFGC recorded a Declaration of Restrictive Covenants with the Somerset County Clerk. The Declaration restricted the use of the cottages to "lodging" and "entertainment," with provisos that no cottage "may be used as the principal residence of any owner or occupant," and that no individual "may occupy the Lot for more than eight (8) consecutive months, and in the event of any such consecutive use, at least one (1) month of such consecutive use shall occur in the months of June, July, and/or August." The Declaration also provided that ownership of a cottage was restricted to those persons who were members of the adjacent golf club.
On April 5, 2006, HFGC applied to the Borough's zoning official for a permit authorizing construction of a second cottage to be built on Lot 13.13. The Borough zoning official denied this second permit application on April 27, 2006, because he had concerns about the manner in which HFGC was marketing the cottages. The official informed HFGC that he would not attempt to rescind the previously-granted permit for the first cottage, but that he instead would "deal with the problem when application is made for the occupancy permit [for the first cottage] if this matter is not settled by that point in time." HFGC sought the Board's review of the zoning official's adverse determination.
Meanwhile, on April 25, 2006, two days before the zoning official's denial of the second construction permit, the Borough adopted Ordinance No. 879.[1] That ordinance amended the subject property's *453 zoning, reclassifying it from the R-2A zone to the RR-5 zone. Like the R-2A zone, the newly-adopted RR-5 zone permits single-family dwellings, as well as age-restricted communities. However, the RR-5 zone restricts density for such dwellings to.2 units per acre, or one house per five acresan increase in required density from the R-2A zone. The Ordinance was duly published in a local newspaper on May 4, 2006. Pursuant to N.J.S.A. 40:55D-16, the ordinance would not become effective until it was filed with the county planning board. The parties have not informed us of that filing date, but there is no dispute that the ordinance became effective before December 5, 2006, i.e. within five years of the final approval issued on December 5, 2001.
Plaintiff, Friends of Peapack-Gladstone, a coalition of local residents opposed to the development plans, filed a complaint in the Law Division ("plaintiff's first complaint") on May 9, 2006. The complaint sought a declaratory judgment "as to violations by HFGC of the Board's resolutions and the restrictive covenants relative to the golf cottages." Plaintiff also sought injunctive relief. HFGC counterclaimed for declaratory relief, contending that it was "entitled to construct the golf cottages and sell them in fee simple to golf club members for non-permanent use ... [.]" Thereafter, plaintiff obtained leave to amend its complaint to assert claims for rescission and reformation of the restrictive covenants.
After limited discovery, HFGC moved for summary judgment. The motion was granted by the trial court. In particular, the court ruled that: (1) plaintiff's claim for rescission lacked merit; and (2) HFGC had complied with its zoning approvals because it was prohibiting the golf cottages from being used as permanent, full-time residences. Plaintiff did not appeal those determinations.
While plaintiff's first lawsuit was pending in the Law Division, other significant events were occurring at the municipal level. On July 20, 2006, HFGC filed another application with the Board, once again attempting to modify the conditions imposed by the previous approvals granted for the property. HFGC specifically proposed to remove the prohibition on "primary" residences in favor of a restriction based on age. In that regard, HFGC presented supporting expert testimony of a professional engineer, a traffic engineer, and a professional planner. Among other things, the developer's experts contended that its request to remove the "primary residence" condition from the project would have no impact on the existing infrastructure or subdivision plan. The traffic expert also opined that age-restricted communities generate little traffic. He further emphasized that no changes were being made to the project's open space requirements, and that the project would continue to have no impact on the Borough's population of school-age children.
The Borough's planner favored HFGC's request to modify the restriction on the use of the cottages. The planner agreed with HFGC's expert that age-restricted housing generally produces less traffic than other kinds of housing. He also noted that when the approvals were initially granted to HFGC's predecessor in 1999, the applicant could have lawfully built thirty-four single-family units within the R-2A zone as a permitted use. Additionally, the planner found significant that HFGC had agreed to pay approximately $700,000 toward the Borough's affordable housing obligation administered by the Council on Affordable Housing ("COAH").
Following the hearings on August 2, August 16, and October 4, 2006, at which no objectors testified, the Board voted 4-to-3 in favor of the application. However, the *454 Board determined that a 5-to-2 "supermajority" vote was legally required for the approval, and thus its vote by a majority of one vote actually constituted a denial. The Board's decision was memorialized in a November 1, 2006 resolution.
On that same day, the Board also considered HFGC's appeal of the zoning official's denial of its request for a permit to construct the second cottage. The Board upheld the zoning official's decision. The Board specifically found that the cottages HFGC was seeking to build deviated from the conceptual size and architectural requirements that had been originally presented to the Board in 1999 on a preliminary basis and given final approval in 2001.
As a result of those adverse determinations, HFGC filed a complaint in lieu of prerogative writs against the Borough and the Board in the Law Division on February 14, 2007. Specifically, HFGC: (1) challenged the denial of its application for modification of the use conditions; (2) challenged the Board's affirmation of the zoning official's denial of a construction permit; (3) sought a declaratory-judgment that it could construct the eighteen cottages and sell them in fee simple; (4) sought injunctive relief pertaining to the certificate of occupancy for the first cottage; (5) sought damages for an alleged governmental taking without just compensation; and (6) sought the application of principles of equitable estoppel against the Board.
Shortly after HFGC's prerogative writs action was filed, negotiations ensued involving HFGC and Borough representatives. Those negotiations generated a proposed settlement. Consequently, on March 2, 2007, the Law Division remanded the matter to the Board to consider the proposed settlement formally.
The proposed settlement, in essence, authorized HFGC to convert the project from corporately-owned golf cottages to age-restricted residential units, subject to numerous conditions. In particular, the settlement contemplated that the underlying use of the golf cottages would remain residential in nature, with a prohibition on residency by school-age children. The golf cottages would only be sold to members of the golf club. The floor area of seven of the residences would be limited in size and would have a lower floor area ratio than that permitted under the original approvals. The size of seven of the residences would not be permitted to exceed 4,500 square feet. The developer would be required to plant landscaping to limit the view of the homes from Fowler Road. The age-restricted homes would be limited to one-and-a-half stories in front elevation and two-and-a-half stories in rear elevation, and would be subject to detailed design guidelines.
In addition, the proposed settlement envisioned that garages on twelve of the age-restricted homes would be limited to two-bay car garages, and the remaining six would be limited to three-bay car garages. The intersection of Pine Meadow Lane (the private road in the development) and Fowler Road would be reconfigured, so as to discourage left hand turns onto Fowler Road, and appropriate signage would be installed. HFGC also agreed to construct a six-bedroom group home to satisfy the Borough's COAH requirements resulting from the development. Alternatively, if such a home could not be built, HFGC would contribute to the Borough's affordable housing trust fund, which contribution could total as much as $750,000. The settlement thus would apparently result in the equivalent of six affordable housing units being constructed by HFGC, almost three times the affordable housing obligation generated by the project, which would apparently create a substantial financial *455 and regulatory benefit to the Borough.
Further, as part of the settlement, HFGC would release any claims for damages against the Borough and the Board in connection with HFGC's complaint, and its cross-claims and third-party complaint. HFGC would dismiss its complaint, and the Borough and the Board thereby would not be exposed to incurring substantial additional legal fees, costs, and a potential judgment if HFGC had been successful.
The Board considered the settlement at a hearing on May 2, 2007. The hearing was patterned after Whispering Woods, supra, 220 N.J.Super. at 161, 531 A.2d 770. During that hearing, the Borough's planner testified at length in support of the proposed settlement.
With respect to density considerations, the planner noted that the proposed settlement recognized that in 1999, the property could have been developed with thirty-four residential lots at minimum lot sizes of 20,000 square feet (less than an acre). However, the Board approved eighteen residential lots, ranging in size from 29,000 square feet (.67 acres) to 40,000 square feet (.92 acres). These residential lots, when considered along with the open space set-aside, amounted to a gross density for the entire property of approximately one unit per four acres.
Additionally, the settlement contemplated that the residences will be a maximum of one-and-a-half stories from the front and two-and-a-half stories from the rear. Elevation restrictions would pertain to the existing grade so that fill could not be brought to the site during construction. Further, exterior design controls would be in place, including a prohibition on fencing; limits on the size of certain accessory-structures; no exterior floodlights, spotlights or driveway lighting; a prohibition on overnight exterior lighting; minimum spending requirements for landscaping, walkways, and irrigation; and numerous requirements and restrictions regulating materials and design of the homes, porches, and decks.
With regard to the COAH implications of the settlement, the planner noted that although the Borough's obligation for affordable units generated by the eighteen residences would be 2.25 units, the settlement would substantially exceed that level. The settlement called for HFGC to design and construct a new six-bedroom group home to be approved by the Borough, which would be credited as six units against the Borough's COAH obligation, more than three times the obligation generated under current COAH rules.
Having reviewed the proposed settlement terms in detail, the Borough planner concluded in his testimony that:

[T]his Settlement Agreement combined with the guidelines goes far beyond anything that has come into play before this Board, certainly as far back as 1999, more recently 2006, and provides a great deal of controls regarding the planning issues affecting the development of this property.

....
I must say that in the beginning of the process I had a number of questions that I raised, I raised at public meetings of this Board and there has been a very, very cooperative effort among all the parties to try to address those concerns as well as others and I think the current Settlement Agreement as written and coupled with the design guidelines as attached thereto more than satisfy those concerns and I think the end result will be a very, very positive development for the Borough with protection to the residents along Fowler Road and elsewhere in the municipality.

*456 [(Emphasis added).]
The Board entertained presentations from several objectors at the Whispering Woods hearing. Several of the objectors were represented by private counsel,[2] who also spoke in opposition.
Based on some particular concerns that were voiced by objectors and Board members during the hearing, HFGC agreed to make the following additional changes to the proposed settlement terms:
 A prohibition of a left-hand turn from Pine Meadow Lane onto Fowler Road;
 Reconfiguration of the Pine Meadow Lane/Fowler Road intersection would be subject to approval by the Borough Engineer;
 The inclusion in the settlement agreement of a reference to the [Whispering Woods] hearing before the Board;
 The creation of a property owners' association to enforce the restrictive conditions and to maintain common property;
 An indication that the age restriction will be set forth in a deed restriction and in the Declaration of Covenants, so that it runs in perpetuity, subject only to adjustment by the Board after public notice and hearing;
 Inclusion in the Settlement Agreement of a representation that HFGC would comply with the Federal Fair Housing Act, [42 U.S.C.A. §§ 3601 to 3631], in connection with its Developers' Agreement with the Borough.
At the conclusion of the Whispering Woods hearing, the Board voted 5-to-2 in favor of the settlement. That decision was memorialized in a June 6, 2007 resolution. The resolution cited several provisions from paragraphs eleven and twelve of the settlement that the Board found to be particularly beneficial to the Borough:
[11.] a. [T]he subdivision relief [for the property] had previously been granted and perfected. The approval took place at a time when the property was located in the R-2A Zoning District which permitted a density of one unit per two acres. The subject property contains 73.25 acres and could have been developed with 34 lots. The proposal that was approved provided for one unit per [four] acres of land, with the units clustered and surrounded by open space and with 19.669 acres dedicated to open space/golf club use. The Board finds that the project's less than permitted density with clustering was and is desirable in preserving the rural character of the Borough. These aspects of the prior approval are carried forward in the proposed settlement agreement.
b. [O]pen space substantially surrounds and isolates the eighteen lots. The Board deems this aspect of the project to continue to be desirable and an advancement of the purpose of the Master Plan in preserving the rural character of the subject portion of the Borough.
c. The eighteen homes will be age-restricted, thereby assuaging one of the concerns which led the Board to look favorably on the proposed golf cottage proposal in the first place, i.e., providing housing which will not place a burden on the Borough's school facilities.
d. [T]he settlement provides that the Pine Meadow Lane/Fowler Road intersection will be reconfigured so as to substantially discourage both left vehicular turns out of the project onto Fowler Road and right turns from Fowler Road into the project. Rather, that traffic will be directed to and from Route 206 *457 to the north. The properties south of the subject property will therefore be virtually free of any negative aspects of the traffic in and out of the proposed subdivision. The Board finds that this, too, will preserve the rural character of the area enjoyed by the existing property owners in the immediate area.
e. The [settlement] [a]greement further provides that the proposed houses will be limited as to their area and height. Specifically, the houses will be subject not only to the Floor Area Ratio of 0.15 which was applicable to the R-2A Zoning District, but also the seven houses most visible from Fowler Road will have an additional constraint of having an area equal to the Floor Area Ratio of 0.15 or 4,500 square feet, whichever is less.
f. [T]he proposed settlement will limit the seven houses closest to Fowler Road to a single two car garage and an additional space which "shall only be wide enough to accommodate a golf cart and not an automobile." The agreement will therefore serve not only to minimize the overall size of those houses, but will also encourage the use of golf carts to and from the golf course, rather than automobiles on public roadways, thus further reducing the amount of automobile traffic.
g. [T]he settlement provides for all houses to have a height of one and one-half story from the front and two and one-half stories from the rear, with the first floor elevation not to be higher than three feet above the existing grade. The Board finds that these added requirements would serve to reduce the mass and profile of the houses and, thereby further reduce, if not eliminate, their visibility to neighboring property owners.
h. The settlement agreement requires vegetative screening on all of the lots closest to Fowler Road which will "limit the view of the age restricted homes constructed on the lots from Fowler Road."
i. Other lesser, but still important controls over the houses and project are the design standards that are an integral part of the settlement agreement and which are not otherwise found in the ordinance. The Board finds that they will limit the impact of the houses in the general area:
(1) No fences will be permitted. Rather, quarried stone or clay brick walls are required.
(2) The total area of all outbuildings and accessory structures may not exceed 700 square feet.
(3) No flood lights, spotlights, or overnight lighting will be allowed.
(4) At least 5% of the construction costs must be devoted to landscaping, walkways and irrigation systems.
(5) Add-on decks will not be permitted.
12. Finally, and perhaps most importantly, the settlement agreement requires the Applicant to substantially satisfy the Borough's COAH requirement. Under present regulations, COAH requires one affordable housing unit for every eight market value units. This requirement would therefore mandate 2.25 affordable units in connection with this project. The settlement requires the Applicant to both design and construct (not merely pay for) a new six bedroom group home (i.e. Alternative Living Arrangements) on Borough-owned property. This is equivalent to the construction of six affordable housing units. Thus, the Applicant will satisfy not only the COAH requirement resulting from this project, but also additional *458 affordable housing obligations applicable to the Borough.
The Board's resolution approving the settlement also contained the following findings germane to pertinent legal requirements of the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-1 to -163:
1. The Board is satisfied that the failure to meet the present density requirements of the ordinance have been overcome by a variety of aspects of the application, many of which are the subject of the settlement agreement. Specifically, the development, although consisting of small lots, is nevertheless part of a much larger approximately 73 acre tract. Moreover, the project is surrounded and buffered by substantial areas of open space. The size and height of the houses will be limited. The roadway out of the property will be configured such that there will be little, if any traffic impact on the homes to the south along Fowler Road, and the new houses in the project closest to Fowler Road will be placed behind a substantial vegetative buffer. Given these aspects of the proposal, the Board finds that the [developer's] lack of compliance with regard to density does not adversely affect the suitability of the site for the proposed development. Additionally the proposed settlement will enable the Borough to provide affordable housing units in excess of the units required as a result of the construction of the [eighteen] homes. Accordingly, the Board finds and concludes that the settlement satisfies the positive criteria [of N.J.S.A. 40:55D-70.]
2. With regard to the negative criteria, [Coventry Square, Inc. v. Westwood Zoning Bd. of Adj., 138 N.J. 285, 650 A.2d 340 (1994)] instructs that the proposal must meet both prongs of the statutory requirement.
3. In the first prong [of N.J.S.A. 40:55D-70], i.e., that the variance can be granted "without substantial detriment to the public good" the focus is on the effect on surrounding properties of the grant of the variance for the specific deviation from the conditions imposed by the ordinance. In this regard, the Board finds that the impact on neighboring property owners will be minimal. Once again, the Board points to the insulation of the project by large amounts of surrounding open space, vegetative buffering, reconfiguration of the road into the project, and the limitations placed upon size and height of the structures [.] The Board further finds that the character of the neighboring properties will not be substantially adversely affected by this project.
4. With regard to the second prong of [N.J.S.A. 40:55D-70], i.e., that the variance will not substantially impair the intent and purpose of the zone plan and zoning ordinance, the Board notes first of all that the proposed usesingle family dwellingsis permitted in the zone. The density, when considered in the context of the 73 acre area of the original site results in a density which is only slightly less than the five acres per dwelling unit that is required. Moreover, in the further context of development of the entire site as a golf/equestrian community, an overwhelmingly high percentage of the property will not contain houses or any other structures. Therefore, the Board finds that the proposed development is reconcilable with the requirement of the zoning ordinance with which the project does not comply.
5. In the alternative, if the applicable standard for this Board to approve the settlement, as suggested in Whispering Woods is that the settlement cannot be "illegal," this Board finds and concludes *459 that the proposed settlement is not illegal.
On June 13, 2007, HFGC published a public notice of the Board's approval of the settlement. The settlement was signed on June 27, 2007, by representatives of HFGC, the Borough, and the Board, as well as by a representative of the golf club.
On August 3, 2007, plaintiff filed a second complaint in lieu of prerogative writsthe complaint that forms the basis of this appealchallenging the Board's approval of the settlement ("plaintiff's second complaint"). After HFGC unsuccessfully attempted to dismiss plaintiff's second complaint as untimely, the Law Division heard oral argument on the merits of plaintiff's challenge.
Thereafter, on April 21, 2008, the trial court issued a written opinion dismissing plaintiff's second complaint and validating the settlement in all respects. After citing to the settlement approval procedures endorsed in Whispering Woods, supra, 220 N.J.Super. at 161, 531 A.2d 770, the trial court noted the following:

No request to alter the density of the property was made. The testimony showed that there was no change in the number of lots proposed. The approved density was for [eighteen] homes and the settlement agreement provides for the construction of [eighteen] age restricted residences. Therefore, there was no need for a density variance and the [B]oard did not improperly grant such a variance.
The [B]oard actions were not arbitrary, capricious and unreasonable. The [B]oard took great pains over a protracted period to consider all the facets of this proposed development and to fulfill the municipality's development standards.
....
The court finds that this settlement is fair and reasonable due to the fact that the [B]orough has a substantial voice and control over the development.
According to Ordinance 23-18.15 adopted in this matter [in 1999], "the [B]oard and an applicant may mutually agree to extend the time limit specified for action. Such extension [may be] made in writing or verbally at a public meeting of the Board for a specific period of time." It is clear from the record below that the parties did in fact make this agreement. The Board recognized the fact that actions of the Board and the ensuing litigation made it impossible for H[F]GC to conclude the development during the original 10 year period set forth in the 1999 resolution. Therefore the [c]ourt finds that the [p]laintiff's argument that the Ordinance bars the extension [of time] is without merit.
Also, issue has been made in the reference to the notice of the "Whispering Woods" hearing. The court finds that notice was in accordance with established case law. The public was permitted to speak and represented by former counsel.... The settlement was approved by and memorialized in written resolution.
[(Emphasis added).]
Plaintiff's appeal to this court followed. On the whole, plaintiff argues that the trial court erred, both procedurally and substantively, in ratifying the settlement. Plaintiff also contends that the settlement hearing was not fair and reasonable, and that the Board's determination was arbitrary, capricious, and ultra vires.
More specifically, plaintiff argues that the Board acted improperly in concluding that no density variances were required for the project in its revised, age-restricted form, and that HFGC had failed to satisfy its burden of demonstrating the propriety *460 of such density variances. Plaintiff further argues that the public notice of the Whispering Woods hearing was defective because it made no mention of any density variances.
Lastly, plaintiff argues that the trial court erred in holding that the developer's period of statutory protection from zoning changes, pursuant to N.J.S.A. 40:55D-21, had not lapsed.
We now consider these arguments.

II.
Whispering Woods, supra, 220 N.J.Super. at 161, 531 A.2d 770, confirmed the authority of a local land use board to settle disputes with an applicant that challenges, in an action in lieu of prerogative writs, a board's earlier denial of developmental approval. The procedures followed in that case have become known, in practice, as a "Whispering Woods hearing." Because plaintiffs in the present appeal challenge procedural and substantive aspects of the Whispering Woods hearing conducted before the Board and reviewed by the trial court, a brief discussion of the chronology and the holding in Whispering Woods is warranted.
In Whispering Woods, the developer sued a local planning board when that board denied the developer's applications for conditional use, site-plan, and subdivision approvals to build a 215-unit residential complex and golf course. Id. at 163, 531 A.2d 770. The developer filed an action in lieu of prerogative writs in the Law Division seeking to nullify the board's denials. Ibid. While the litigation was pending, the developer's attorney met with the board in a closed session of a regular board meeting to explore possible settlement. Id. at 165, 531 A.2d 770. At that closed session, a majority of the Board indicated that they were inclined to vote in favor of the settlement by virtue of an informal poll. Ibid. Counsel for the board and the developer then negotiated the specific terms of a settlement, which were reduced to writing. Ibid. The proposed settlement and the associated revised plans of the developer were placed before the board at another public meeting, at which a majority of the board approved the settlement and the revised plans.
Meanwhile, various civic associations, neighbors, and other objectors filed a motion to intervene in the prerogative writs action, which was granted. Ibid. In light of these lingering objections, the board scheduled, with a public notice advertised in the newspaper, a second public hearing, at which time residents and their attorneys were invited to present any comment or objections relating to the settlement. Id. at 167, 531 A.2d 770. After considering such public input at the second meeting, the board issued a written resolution to confirm the stipulation of settlement. Id. at 168-69, 531 A.2d 770.
Following these proceedings before the board in Whispering Woods, objectors to the development argued in the Law Division that the board lacked jurisdiction to reconsider its prior denial and enter into the settlement, in the absence of a specific remand from the court. Id. at 169, 531 A.2d 770. The objectors also contended that the board's actions in approving the settlement were void because they allegedly violated the Open Public Meetings Act, N.J.S.A. 10:4-6 to -21 ("OPMA").
The trial court in Whispering Woods rejected each of these arguments. It ruled that the objectors' jurisdictional argument was without merit because the board retained "the power to settle the pending litigation by tentatively agreeing to an amended plan subject to public presentation, a public hearing thereon, and a public vote." Id. at 173, 531 A.2d 770. *461 Noting the strong public policies favoring settlements, the court observed that there was no need for a formal remand for the board to pursue these settlement endeavors. Id. at 172-73, 531 A.2d 770. "After the tentative settlement, the Board not only had the power to consider the amended plan, it had the statutory responsibility to do so." Id. at 173, 531 A.2d 770.
In endorsing these settlement procedures, the court in Whispering Woods made clear that the terms of the proposed settlement would be subject to notice and public comment no differently than if the terms had been presented in an initial application for land use approval:
[A] settlement must necessarily (as it was here) be conditioned upon a public hearing on the agreed planjust as if a new application were being presented to the Board. In other words, any settlement must lead to a further official action by the public body. That action is subject to all of the statutory conditions necessary to vindicate the public interestnotice, public hearing, public vote, written resolution, etc. In addition, it is further subject to the complaint in lieu of prerogative writs.
[Id. at 172, 531 A.2d 770 (emphasis added).]
Additionally, the court in Whispering Woods rejected the objectors' claims of OPMA violations arising out of the "closed door" session at which a proposed settlement was initially broached. Id. at 173-74, 531 A.2d 770. The court held that any violation was vitiated by the two ensuing public hearings, at which the settlement was openly discussed and approved. Id. at 174, 531 A.2d 770.
The procedures employed in Whispering Woods have since been approved in other land use cases. See, e.g., Gandolfi v. Town of Hammonton, 367 N.J.Super. 527, 843 A.2d 1175 (App.Div.2004) (upholding a land use settlement after a hearing that comported with Whispering Woods); Warner Co. v. Sutton, 274 N.J.Super. 464, 644 A.2d 656 (App.Div.1994) (remanding a land use settlement where the record did not substantiate that the proposed settlement was ever discussed at a public meeting prior to the entry of a consent order containing the settlement terms). See generally William M. Cox, Zoning and Land Use Administration § 33-7 (2009) (citing Whispering Woods for the proposition that a dispute between a municipal board and a land use applicant may be settled while the matter is pending in the Law Division, if the terms of the settlement are "subject to public presentation, a public hearing thereon and a public vote").
As the trial court correctly recognized in this case, the Whispering Woods hearing conducted by the Board on May 2, 2007, comported with these core elements. The hearing was duly advertised to the public with an appropriate notice. The notice summarized the key aspects of the proposed settlement, particularly the developer's request to change the use of the cottages from corporate accommodations to age-restricted, single-family dwellings. The hearing was open to the public, and apparently well-attended. The proposed settlement was the sole item of business.
The hearing consumed over four hours, not concluding until after midnight. The Borough's planner presented detailed testimony analyzing the merits of the proposed settlement, with the sworn concurrence of the Borough engineer, who also appeared. Specific objections to the settlement were presented at the hearing by an attorney representing several of the residents who were opposed to the project. The Board also heard comments from more than a dozen residents concerning the settlement proposal. After considering all of those points, the Board ratified *462 the proposed settlement and issued a detailed resolution explaining the rationale for the Board's decision.
In sum, the process utilized by the Board here, as in Whispering Woods, fulfilled "all of the statutory conditions necessary to vindicate the public interest," including "notice, [a] public hearing, [a] public vote, [and a] written resolution." Whispering Woods, supra, 220 N.J.Super. at 172, 531 A.2d 770. We reject plaintiff's contention that the process was deficient because the developer's experts did not testify at the Board's hearing to consider the settlement. Those experts had already testified at previous public hearings before the Board and were questioned at that time by counsel for the objectors. Moreover, the Borough's own expert planner and engineer adequately presented the features of the settlement at the hearing, thereby presumably affording the Board members and the public a more objective summary for their consideration than that which would have been provided by the developer's experts.
On the merits, the trial court concluded that the settlement terms were "fair and reasonable." We perceive no reason to disturb that considered finding, particularly given the judiciary's limited standard of review of local land use decisions. Kramer v. Bd. of Adj., Sea Girt, 45 N.J. 268, 296-97, 212 A.2d 153 (1965). Although we are mindful that the Board changed its position after HFGC's prerogative writs action was filed, the Board was entitled to reconsider the advantages and disadvantages of the revised development with the professional input of its planner, engineer, and counsel.
Plaintiff's central attack upon the Board's approval of the settlement concerns the fact that the project, in its current form, does not comport with the stricter density requirements of the RR-5 zone ascribed to the property when it was rezoned in 2006. As we have already noted, the RR-5 zone restricts density to one residential unit per five acres, whereas the R-2A zone, which formerly covered the property, allowed a density of one unit per two acres.
It is undisputed that the eighteen dwellings proposed by HFGC, whether they are used as corporate cottages or as single-family, age-restricted residences, would entail about one unit for every four acres of land. This density satisfies the two-acre requirement of the R-2A zone, but it fails to meet the five-acre requirement of the RR-5 zone.
Therefore, plaintiff argues that HFGC was required to secure density variances from the Board in order to go forward with the development in its amended form, and that HFGC failed to demonstrate to the Board at the settlement hearing why such variances should be granted under the pertinent statutory positive and negative criteria set forth in N.J.S.A. 40:55D-70. As a related procedural challenge, plaintiff maintains that the notice of the May 2, 2007 public hearing was deficient because it omitted any reference to a need for density variances. See Pond Run Watershed Ass'n v. Twp. of Hamilton Zoning Bd. of Adj., 397 N.J.Super. 335, 937 A.2d 334 (App.Div.2008) (requiring public notices of variance requests to contain material facets of the variances sought); Perlmart of Lacey, Inc. v. Lacey Twp. Planning Bd., 295 N.J.Super. 234, 684 A.2d 1005 (App.Div.1996) (same); cf. N.J.S.A. 40:55D-11.
Plaintiff's central assumption that HFGC was required to obtain density variances for the proposed development is mistaken. No such variances were necessary here because the developer, by virtue of the prior approvals obtained from the *463 Board, was protected by law from the intervening rezoning of the property into the RR-5 zone in 2006. The trial court reached that same conclusion, albeit based upon time calculations somewhat different than those which we now set forth.
Initially, the project was expressly afforded by the Board, when it granted preliminary site plan approval on February 3, 1999, ten years of protection from zoning changes for the golf cottages. That initial ten-year period of relief was within the Board's authority to grant under N.J.S.A. 40:55D-49(a), which allows a land use board to insulate a developer from changes to, among other things, "lot size" requirements. Subsection (b) of that statute authorizes a land use board to grant such protection for a period "larger than three years," provided that doing so is reasonable and in the public interest. See N.J.S.A. 40:55D-49(b).
The initial ten years of protection the Board granted at the preliminary site plan phase was terminated by operation of law, however, when the developer subsequently obtained final site plan approval for the cottages in 2001 and, thereafter, amended the final site plan approvals for Phases One and Two in 2003 and 2004, respectively. As N.J.S.A. 40:55D-52(a) specifically instructs, "the granting of final [site plan] approval terminates the time period of preliminary approval." The trial court overlooked this statutory termination requirement in its analysis, erroneously finding that the ten-year preliminary protection originally granted by the Board in 1999 was still in effect when the Whispering Woods hearing took place in 2007.
Even so, the developer's protection from rezoning changes was re-established on December 5, 2001, when the Board granted final major subdivision approval. Pursuant to N.J.S.A. 49:55D-52(a), "[t]he zoning requirements applicable to the preliminary approval first granted and all other rights confirmed upon the developer... whether conditionally or otherwise, shall not be changed for a period of two years after the date on which the resolution of final approval is adopted[.]" (Emphasis added). Moreover, pursuant to that same statutory provision, a land use board "may extend such period of protection for extensions of one year but not to exceed three extensions." Ibid. (emphasis added). Such three years of further extensions may be granted by a land use board retroactively.[3]See N.J.S.A. 40:55D-52(c).[4] Consequently, a developer that secures final approval may obtain up to five years of additional protection from subsequent zoning changes after such final approval is issued. See Cox, supra, § 15-5.2 at 374-76.
Plaintiff contends that, giving HFGC the full benefit of statutory protection, HFGC's protection from rezoning lapsed on December 5, 2006, i.e., five years from the Board's issuance of final subdivision approval on December 1, 2001. Because that December 5, 2006 date preceded the Whispering Woods hearing in May 2007, plaintiff maintains that, in essence, the clock ran out on HFGC, thereby rendering applicable the stricter density requirements now in force for the RR-5 zone. This argument fails for several reasons.
First, there is a reasonable claim that the five-year period of protection began anew in April 2003 for the seven dwellings *464 in Phase One and in July 2004 for the other eleven dwellings in Phase Two, when the Board issued the amended preliminary site plan approvals for each of those respective portions of the parcel to address the sewer-related issues that arose. If those Board actions are each deemed new trigger dates, the developer's five-year period of zoning protection would arguably extend for the seven units through April 2008 and for the eleven units through July 2009, which both post-date the May 2007 Whispering Woods hearing. We need not adopt that particular analysis advocated by HFGC, although it is worth mentioning, because there are independent and sufficient grounds for tolling of the five-year period of protection that presumptively would have ended in December 2006.
The appropriate tolling analysis is as follows. Under the MLUL:
In the event that, during the period of approval heretofore or hereafter granted to an application for development, the developer is barred or prevented, directly or indirectly, from proceeding with the development otherwise permitted under such approval by a legal action instituted by any State agency, political subdivision or other party to protect the public health and welfare or by a directive or order issued by any State agency, political subdivision or court of competent jurisdiction to protect the public health or welfare and the developer is otherwise ready, willing and able to proceed with said development, the running of the period of approval under this act or under any act repealed by this act, as the case may be, shall be suspended for the period of time said legal action is pending or such directive or order is in effect.

[N.J.S.A. 40:55D-21 (emphasis added).]
This tolling provision in N.J.S.A. 40:55D-21 thereby can suspend the five-year statutory maximum period of protection, to take into account the adverse impacts of governmental action or litigation that interfere with the developer's ability to proceed with the project. However, the tolling statute is not designed to deal with situations that are "common in land planning contexts in which a single development is subject to approval processes in different [governmental] agencies," such as the various layers of approval that often may be needed from state, county, and local agencies. Jordan Developers, Inc. v. Planning Bd. of City of Brigantine, 256 N.J.Super. 676, 681, 607 A.2d 1054 (App. Div.1992).
Here, there were at least two major and intervening events, which were not of a "common" variety, both of which interfered with HFGC's ability to proceed with construction before the December 2006 presumptive five-year period of protection concluded. Each of those events qualified under the terms of N.J.S.A. 40:55D-21 to toll the developer's period of protection from a zoning change.
The first tolling event was the Borough zoning official's determination on April 27, 2006, declining to issue a building permit to HFGC because of his perception that the project was being advertised in a manner contrary to the Board's prior approvals. The zoning official is plainly an agent of the "political subdivision," who is authorized by statute to enforce the municipality's laws and ordinances. See N.J.S.A. 40:55D-18; see also Cox, supra, § 52-7 at 938. The zoning official's adverse decision in April 2006 was manifestly an effort on his part, and one which we regard as taken in good faith, to "protect the public health and welfare" in the Borough, see N.J.S.A. 40:55-21. His decision was aimed at assuring that the units that *465 were built were constructed for occupancy consistent with the strict corporate usage limitations prescribed in the Board's prior approvals. The zoning official's determination, which was subsequently appealed by HFGC to the Board itself, had the direct and indirect effect of halting the developer's work on the project, at a time at which the developer was evidently "ready, willing and able to proceed" with the building of the next dwelling. Ibid.
The zoning official's decision was subsequently upheld by the Board in the resolution of November 1, 2006. HFGC then sought judicial review of that adverse ruling in its ensuing prerogative writs action, which was ultimately resolved by the settlement agreement. We are satisfied that the time period following the zoning official's decision suspended the running of the developer's period of statutory protection.
As a separate basis for tolling, the filing of the first lawsuit by plaintiff in May 2006 also substantially thwarted the developer's ability to proceed with construction. The lawsuit specifically sought to declare HFGC's development of the site illegal, and to enjoin further construction. Although the Law Division did not grant plaintiff a temporary restraining order or preliminary injunction, the litigation posed another realistic and formidable obstacle to advancing the project. The nature of the legal arguments raised by plaintiff in the first lawsuit, as well as in the present lawsuit, sufficiently implicate matters of "public health and welfare" to trigger the tolling protections of N.J.S.A. 40:55D-21.
Consequently, the developer's period of protection did not expire prior to December 5, 2006, as argued by plaintiff, but rather continued as the zoning official's decision and plaintiff's own affirmative claims challenging the project were being litigated. The Board's denial of a use change at the November 1, 2006 meeting, which occurred by virtue of a failure to obtain the required supermajority vote, was then appealed by HFGC in its own prerogative writs action, which further held up the development's progress. It was not until the Whispering Woods hearing on May 2, 2007, and the associated Board resolution on June 6, 2007 approving the settlement, that the developer had clearance to resume the project.
That clearance proved to be short-lived, as the result of plaintiff's second lawsuit filed on August 3, 2007, challenging the settlement and the Whispering Woods hearing. That brief interval of about two months from June 6 to August 3, 2007, when litigation resumed, provided the developer with no realistic opportunity to complete the previously-approved project. Moreover, even if that two-month interval is subtracted from the total five-year period of maximum protection, that still would not consume the entire balance of approximately eight months that remained unused when the zoning official effectively halted the project in April 2006.
For these many reasons, HFGC's period of statutory protection remained in force when the property was rezoned by Ordinance No. 879 in the spring of 2006. Hence, the stricter density requirements of the RR-5 zone do not pertain to this development. For that reason, the developer was not required to obtain density variances as part of the settlement agreement. The settlement, in essence, focused primarily upon the project's change of use rather than a change of density. That is, eighteen dwellings were still being built on the same-sized lots. Had the latter been involveda change in densityour legal analysis of these "grandfathering" issues would be fundamentally different.
*466 Finally, we turn to the amount of time now remaining for HFGC to complete construction and take advantage of the two-acre density requirement of the prior R-2A zoning. The Board anticipated the developer's need for more time to complete this controversial and highly-litigated project, by including in the settlement agreement and the concomitant resolution, a provision granting the developer until February 3, 2013, or a total of fourteen years from the 1999 preliminary approvals, to complete the project. Plaintiff objects to that date, in the event that its main objections to the settlement are rejected, arguing that the Board lacked authority to grant a six-year period of protection in 2007.
We agree with plaintiff that the six-year extension is not authorized under N.J.S.A. 40:55D-52(a) because the approval generated by the settlement is not of a "preliminary" nature. Consequently, the Board did not have the authority to go beyond the ordinary two-year period protecting "final" approvals in N.J.S.A. 40:55D-52(a), subject to three one-year extensions, for a total of five years. That difference of a year (five years versus six) is inconsequential, however, because the pendency of the current appeal and the underlying Law Division proceedings on plaintiff's second lawsuit (which have consumed more than two years to date) tolled the time construction in any event. See N.J.S.A. 40:55D-21; see also S.T.C. Corp. v. Planning Bd. of Twp. of Hillsborough, 194 N.J.Super. 333, 336, 476 A.2d 888 (App.Div.1984) (noting that "under general equitable principles" a developer may receive the benefit of statutory protection against a change in use requirements occurring while a land use board's action on the developer's application is being litigated). For this reason, we will not curtail the period of protection granted by the Board, and do not resolve whether any further extension past February 2013 is warranted.
We have carefully considered the balance of plaintiff's arguments, and find them lacking sufficient merit to discuss in this opinion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] It does not appear from the record that the zoning official's denial of the second permit was based upon the Borough's then-recent adoption of Ordinance No. 879.
[2] That attorney is not the same attorney representing appellant on the present appeal.
[3] The record on appeal does not document exactly how the three one-year extensions were approved here but plaintiff does not contest their existence.
[4] See Aronowitz v. Planning Bd. of Twp. of Lakewood, 257 N.J.Super. 347, 608 A.2d 451 (Law Div. 1992); see also Cox, supra, § 15-15.2 at 375.