982 A.2d 27 (2009)
410 N.J. Super. 314
Carl and Della DARST, Plaintiffs-Appellants,
v.
BLAIRSTOWN TOWNSHIP ZONING BOARD OF ADJUSTMENT, Defendant-Respondent.
DOCKET NO. A-5501-06T2.
Superior Court of New Jersey, Appellate Division.
Argued September 23, 2009.
Decided October 27, 2009.
*28 Richard I. Clark, Sparta, argued the cause for appellants (Laddey, Clark & Ryan, LLP, attorneys; Mr. Clark and Ursula H. Leo, on the brief).
Roger W. Thomas, Newton, argued the cause for respondent (Dolan and Dolan, P.A., attorneys; Mr. Thomas and Anand Dash, on the brief).
Before Judges STERN, COLLESTER and SABATINO.
The opinion of the court was delivered by
SABATINO, J.A.D.
Plaintiffs Carl and Della Darst, residents of, and owners of real property in, Blairstown Township, appeal the Law Division's validation of four discrete conditions imposed by the Township's Zoning Board of Adjustment ("the Board") when granting plaintiffs site plan approval for their property. For the reasons stated in this opinion, we affirm the trial court with respect to three of the challenged conditions, *29 but reverse as to the fourth condition imposing a one-year time limitation upon plaintiffs in achieving compliance with the Board's requirements.

I.
The subject property is situated along Warren County Route 521 (also known as Hope Road) in Blairstown, and is designated as Lots 28, 29, 29.01 and 31.01 on the Township's tax map. The entire property consists of approximately sixteen acres. Lot 31.01 is in the Township's "R-5" zone for residential uses; the remaining lots are in the "H-C" (Highway-Commercial) zone. There is a one-story dwelling on Lot 29 with a swimming pool, another single-family dwelling on Lot 28, and a two-story dwelling and a barn on Lot 29.01. To its east, the property borders Lot 27, which contains a neighbor's residence.
Plaintiffs have owned the subject property for many years and contend that they have used portions of the site for storage purposes throughout their ownership. As of the time of the proceedings before the Board, a 150-foot-long self-storage unit was located on Lot 28 perpendicular to Hope Road, near the front side of the property. In addition, numerous other self-storage units were scattered in the rear of the property.
This dispute was precipitated when plaintiffs were cited in 2002 by a Township zoning officer for their installation of self-storage units on Lots 28 and 31.01 without acquiring permits, which the officer believed were required by ordinance. Plaintiffs, on the other hand, believed that they had a preexisting non-conforming use that allowed storage activities on all four lots.
Plaintiffs consequently filed an application with the Board for an interpretation of the ordinance with respect to their use, as well as an application for a bulk variance and for major site plan approval. The site plan involved an expansion of the number of self-storage units on the property and various reconfigurations of that use. The plan included retention of the dwellings on Lots 28 and 29. Plaintiffs later amended their application to include a request for a use variance. The use variance request was then bifurcated from the original application.
Partial testimony concerning the interpretation issue was presented in hearings conducted in late 2002 and 2003. However, at the suggestion of the Board's attorney, plaintiffs then agreed to table the interpretation issue and instead pursue the use variance as a method of resolving their dispute with the Township. The use variance hearings were further bifurcated, by consent of plaintiffs and the Board, from any site plan approval proceedings that would be required upon the issuance of such a variance.
The Board heard testimony on the use variance in twelve public hearings beginning on November 11, 2003 and ending on October 12, 2004. During the course of those hearings, plaintiffs and their experts explained that they wished to expand their use of the property for self-storage and install three rows of self-storage buildings on Lot 28. They indicated that the existing storage units on Lots 28 and 29 had been used to store equipment, boats, and vehicles, generally by homeowners and businesses. The units would not be used to store hazardous waste materials. Access to the self-storage units would only be during daylight hours and plaintiffs did not seek to place any additional lights on the property. Plaintiffs intended to screen the units with shrubs and an existing chain link fence abutting Hope Road. Plaintiffs' residence and pool house on Lot 29 would screen the outdoor storage and box trailers on that particular parcel.
*30 As part of their proofs in support of the use variance, plaintiffs presented testimony by Alex Van Veldhuisen, the owner of several self-storage facilities in Hunterdon County. Van Veldhuisen stated that such facilities generate little traffic or noise, and tend to function as "drop off" locations without much on-site activity. According to the Board's resolution summarizing his testimony, Van Veldhuisen "indicated that the appearance of the facility is important, not only to surrounding property owners, but also to the owner of the business, since [self-storage] clients usually prefer neat, clean spaces to store their goods."
As another item of supporting proof, plaintiffs moved into evidence at the variance hearing on February 10, 2004 what is identified in the record as exhibit "A-2." That exhibit consists of a September 24, 2002 letter and attachments sent to Carl Darst from Ken Dewees, a representative of Miller Buildings, Inc. ("Miller"), a manufacturer of self-storage units. In his letter, Dewees refers to the building design loads and typical anchoring procedures for Miller storage units. The attachments include general notes about the Miller design criteria, drawings showing the Miller anchoring systems, general specifications, and several pages of product literature, including photographs and artistic sketches of the Miller units.
The record indicates that, prior to the Board's final decision, plaintiffs installed a single row of Miller storage units perpendicular to Hope Road, with the intention of retaining that row of units as part of the new site plan. However, several storage units from a different manufacturer, Sea/Land, were scattered in the rear of plaintiffs' property. The record further contains color photographs of the Miller units, and, by comparison, the Sea/Land units. It appears from the photographs that the Sea/Land units, which commonly are used in transportation, have been adapted and repainted for use on the property in a manner that attempts to have them resemble the Miller units.
Plaintiffs' application drew substantial commentary from the public and several Board members, both at the use variance phase of hearings[1] and at the ensuing site plan phase. According to the use variance resolution, several members of the public who testified expressed concern that plaintiffs "would not abide by any action that would be taken by the Board and that would result in constant enforcement problems." Other comments revolved around perceived detriment to, and the devaluing of, surrounding properties allegedly caused by plaintiffs' prior uses of their land.
At the October 12, 2004 hearing, plaintiffs presented the Board with an alternative plan for the uses of all of the considered lots. Accepting this revised plan as the basis for its action, the Board granted plaintiffs a use variance. The Board's resolution specifically found "that the positive criteria for a use variance can be established on the basis of aesthetic improvements." However, the Board predicated that variance approval upon plaintiffs' subsequent submission of site plans for all the lots.
In particular, the Board's resolution dated November 9, 2004 granting the use variance required plaintiffs to reconfigure Lot 28 in accordance with the revised plan submitted at the October 12, 2004 meeting. *31 That plan envisioned taking a portion of the property from Lot 31.01 and adding it to Lot 28, thereby increasing Lot 28 to approximately two-and-one-half acres in size. The stated purpose of the size increase was to confine all non-residential storage activities on the property to Lot 28. Plaintiffs were also permitted to maintain "[t]he [existing] metal storage building on [Lot 31.01,]" which could be "used only for residential purposes."
The variance resolution further imposed other pertinent conditions. In particular, the Board required that "[t]he only activities authorized on Lot 29 shall be the single-family residence, together with such other accessory activities as may be authorized for single-family residential use." Lot 31.01 was similarly restricted to residential uses only, and the "existing trailers on [that] site" were to be removed. Additionally, the resolution restricted Lot 29.01 to residential uses as well as the storage and use of equipment and a fuel tank for plaintiffs' helicopter and tree service businesses.
With regard to Lot 28, the variance resolution imposed the following conditions:
Lot 28 shall be reconfigured in accordance with [the plan as proposed by plaintiffs on October 12, 2004]. Said reconfigured lot may be used for up to three double rows of self-storage units, up to 15 [units] on each side, for a total of not more than 90 units. Each row shall not exceed 150 feet in length. . . . Said site shall also be authorized for outdoor storage. All storage on site, whether outside or in the self storage facilities, shall not contain any flammable or other hazardous material[.] . . . Said lot shall be landscaped, fenced and buffered so as to screen the activities from surrounding properties and from Route 521. The outdoor storage shall not exceed 15 feet in height. No expanded use of Lot 28 shall be authorized until there is submitted, within three months of the memorialization [sic] of this action, a site plan which will be subject to the review and approval by the Zoning Board and which site plan shall then be accepted by [plaintiffs].
The variance resolution specifically cross-references exhibit A-2 from the February 10, 2004 hearing, which contained the building design, anchoring and other product information for the Miller units. However, the variance resolution did not explicitly state that plaintiffs could only install Miller brand units, or their equivalent, when they expanded the self-storage uses on site.
Following the Board's approval of the use variance in November 2004, plaintiffs filed their application for minor subdivision and preliminary and final major site plan approval with the Board on February 25, 2005. The application included the expanded use of Lot 28, as authorized by the variance, plus a plan for minor subdivision of Lots 28 and 31.01 that would result in taking acreage from Lot 31.01 to increase Lot 28 to slightly more than four acres. The Board held a series of eight public hearings on the application from the spring of 2005 to the fall of 2005.
At the first hearing on the site plan, held on May 10, 2005, Della Darst testified that plaintiffs intended to use "land and sea containers," which would be painted, insulated and vented for use as self-storage units and would be rented out by plaintiffs on Lot 28. She further testified that she and her husband intended to cover the majority of Lot 28's useable area with gravel to accommodate vehicular access to the storage units.
Throughout the course of the site plan hearings, Board members and members of the public expressed concern that plaintiffs' *32 proposed use of Sea/Land containers conflicted with the positive aesthetic reasons that the Board had allegedly relied upon in granting the use variance to plaintiffs in the first place. The majority of the debate on this topic occurred at the hearing on August 9, 2005. Several speakers at that hearing expressed displeasure with the use of Sea/Land containers, asserting that the use of these containers violated the intent of the previously-granted variance. In particular, questions were raised about whether the Sea/Land containers were smaller than the Miller units and whether, once painted and otherwise adapted for use on the site, they would look inferior. On the other hand, other speakers felt the Sea/Land units were cosmetically equivalent to the Miller units and that the visual differences between the two kinds of units would not be appreciable from a distance. There also was some commentary suggesting that the Sea/Land containers were sturdier and safer than the Miller units.
At its November 1, 2005 meeting, the Board began to formulate its conditions that would be included in the site plan resolution. With respect to the kind of storage facilities allowed on the front portion of Lot 28, the initial draft resolution stated that the facilities were to be "manufactured self-storage units similar in character and quality to those which are contained on the property and shall not be the restored [Sea/Land] containers proposed by [plaintiffs]." After objections were raised by certain Board members, that draft language was changed at the December 13, 2005 meeting from requiring "similar" buildings to requiring "identical" buildings.
Plaintiffs' counsel argued to the Board that aesthetic concerns should not control the property owners' choice of storage facilities. Board members countered that the use variance had been granted on the basis of aesthetic improvements to the area, so that aesthetics were a valid concern in evaluating the site plan. Additionally, the Board maintained that it was not requiring plaintiffs to use the Miller buildings exclusively on their entire property, but only in the first three rows of storage perpendicular to Hope Road, as contemplated by the use variance.
Eventually, on December 13, 2005, the Board approved the site plan application. The site plan approval was made subject to twenty-two conditions, which (except for some minor exceptions not pertinent here) the Board required plaintiffs to satisfy within one year.
The Board memorialized its conditional approval of the site plan in a resolution dated March 14, 2006. Plaintiffs then filed an action in lieu of prerogative writs in the Law Division, challenging six of the twenty-two conditions imposed by the Board. After considering plaintiffs' challenge, the Law Division judge invalidated two of the conditions. The judge specifically found that a condition requiring plaintiffs to extract soil samples from the site was preempted by the Spill Act, N.J.S.A. 58:10-23.11 to -23.24. The judge also found that a second condition, imposing certain grading requirements, was not authorized by any municipal ordinance and was thus invalid.[2]
The trial court upheld the other four conditions that plaintiffs had challenged, finding all of them to be authorized under the law and none of them to be arbitrary or capricious. The judge detailed his analysis of these issues in a written opinion.
Plaintiffs now appeal the trial court's ratification of the four challenged conditions. *33 They contend that each of those conditions is arbitrary, capricious and unreasonable. They particularly argue that the Board relied upon impermissible aesthetic considerations in mandating the Miller storage units near the front of the property. They further contend that the landscaping and paving conditions are excessive and punitive. Finally, they maintain that the one-year time limit imposed by the Board is contrary to applicable statutory and ordinance requirements. We now consider those arguments, seriatim.

II.
At the outset, we reiterate well-settled general principles of appellate review that guide our consideration of the issues before us in this land use case. Our task is to review the record to determine whether the land use board's factual findings are based on "substantial evidence" and whether its discretionary decisions are "arbitrary, capricious and unreasonable." Kramer v. Bd. of Adj., Sea Girt, 45 N.J. 268, 296-97, 212 A.2d 153 (1965); see also Ferraro v. Zoning Bd. of Keansburg, 321 N.J.Super. 288, 728 A.2d 863 (App.Div. 1999). A reviewing court generally should defer to the judgment of the local boards because the members of such bodies "are thoroughly familiar with their community's characteristics and are the proper representatives of its people [and] are undoubtedly best equipped to pass initially on such applications." Lang v. Zoning Bd. of Adj. of North Caldwell, 160 N.J. 41, 58, 733 A.2d 464 (1999) (quoting Kramer, supra, 45 N.J. at 296, 212 A.2d 153). Local zoning boards "must be allowed wide latitude in the exercise of delegated discretion." Ibid. (citing Kramer, supra, 45 N.J. at 296-97, 212 A.2d 153.) Thus, "there can be no judicial declaration of invalidity in the absence of clear abuse of discretion by the pubic agencies involved." Kramer, supra, 45 N.J. at 297, 212 A.2d 153 (citing Ward v. Scott, 11 N.J. 117, 93 A.2d 385 (1952)); see also Simeone v. Zoning Bd. of Adj. of East Hanover, 377 N.J.Super. 417, 426, 873 A.2d 571 (App.Div.2005).
Nonetheless, in instances where a site plan condition is proven to be unlawful or unauthorized as a matter of law, a reviewing court need not give deference to the Board's decision. Instead, the court applies a de novo standard of review on such legal issues. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995); Cherney v. Matawan Borough Zoning Bd. of Adj., 221 N.J.Super. 141, 144-45, 534 A.2d 41 (App.Div.1987) (invoking the "traditional rule that the interpretation of legislative enactments is a judicial function, and not a matter of administrative expertise").
Whether a condition is unreasonable or unlawful has been described in our law as follows:
The conditions imposed must be directly related to and incidental to the proposed use of the land, and must be without regard to the person who owns or occupies it. . . . To be valid, conditions must (1) not offend against any provision of the zoning ordinance; (2) not require illegal conduct on the part of the permittee; (3) be in the public interest; (4) be reasonably calculated to achieve some legitimate objective of the zoning ordinance; and (5) not be unnecessarily burdensome to the landowner.
[Orloski v. Planning Bd. of Ship Bottom, 226 N.J.Super. 666, 672, 545 A.2d 261 (Law Div.1988) (quoting 3 Rathkopf, The Law of Zoning and Planning § 40.02 (4th ed.1987)), aff'd, 234 N.J.Super. 1, 559 A.2d 1380 (App.Div.1989).]
Moreover, conditions that are attached to a site plan review or subdivision must be grounded in a statute, ordinance or other *34 legal authority. Pizzo Mantin Group v. Twp. of Randolph, 137 N.J. 216, 233, 645 A.2d 89 (1994). As a leading treatise on New Jersey zoning law has noted, "[w]here variances are required ancillary to the development application . . . conditions would be limited to factors flowing directly from the variance." William M. Cox, New Jersey Zoning and Land Use Administration § 28-4.1 (Gann 2009).
With these principles in mind, we now turn to the four conditions that precipitated this appeal.

A.
The primary argument raised by plaintiffs is that the Board improperly required them to use Miller containers in the three[3] parallel rows of self-storage units near the front of the property perpendicular to Hope Road. Plaintiffs maintain that, as a matter of basic principles under the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -163 ("MLUL"), local land use boards are prohibited, or at the very least, strongly discouraged, from relying upon subjective aesthetic considerations in land use determinations. Plaintiffs further argue that even if such aesthetic considerations may properly apply here, the Board's specific limitation on the brand of storage containers to be used in the three rows is arbitrary and capricious.
Although plaintiffs acknowledge that the Board's resolution granting their use variance does mention "aesthetic" factors, the resolution did not expressly require the use of Miller self-storage units near the front of the property. Given that omission from the use variance resolution, plaintiffs submit, the Board had no authority to hamper them later in the site plan resolution by dictating the use of Miller units at the front of the property.
The Board contends that it is empowered to require Miller units as an aesthetic requirement, in this particular context of a bifurcated land use application, because the so-called "positive criteria" necessary to justify a use variance under N.J.S.A. 40:55D-70(d) specifically included in this case an expectation that plaintiffs would enhance the aesthetic appearance of their property by, among other things, installing three uniform rows of Miller containers near the front of the premises. The Board distinguishes the present situationin which an aesthetic condition flows out of a previously-granted use variance predicated upon aesthetic factorsfrom an ordinary site plan application for a site on which no aesthetically-grounded variance had been approved earlier.
In particular, the Board relies upon Burbridge v. Twp. of Mine Hill, 117 N.J. 376, 387, 568 A.2d 527 (1990), in which the Supreme Court held that aesthetic considerations may at times furnish "special reasons" to justify the grant of a use variance under section 70(d) of the MLUL. Plaintiffs, in rebuttal, assert that the Board has relied too expansively upon Burbridge, and that Burbridge, as a variance case, does not apply to a site plan condition that is based upon aesthetics.
The Board maintains that the absence of any direct reference to the Miller buildings in the November 2004 variance resolution does not defeat its position. That is so because the record shows that the Board clearly contemplated and presumed, as part of the earlier variance approval, that plaintiffs would be installing Miller units, not Sea/Land containers, near the front of the property. The Board submits *35 that the anticipated use of Miller units is indirectly, if not directly, contemplated under the variance resolution because it specifically refers to exhibit "A-2," the multi-page Dewees correspondence submitted by plaintiffs at the February 10, 2004 hearing. That exhibit, as we have already noted, extensively details the features and specifications of the Miller units, along with sketches and photographs of such units. Although the Board's brief on appeal does not use the term "estoppel," the Board's argument in this respect, in essence, is that plaintiffs should be equitably estopped from substituting Sea/Land containers for Miller units once they had gained the Board's approval of their use variance.
In considering the parties' competing arguments on this question of aesthetics, the trial judge observed in his written opinion:
The plaintiffs' argument that a Board does not have any discretion to make aesthetic conditions for site plan approval, i.e., that the Burbridge rule is limited to variance relief, is convincing and might well have carried the day if this case did not, as a practical matter, contain both site plan approval and a variance. Even though the site plan is technically the matter before the [c]ourt, the [c]ourt may and must consider the variance as well. The variance and the site plan are so intimately related that the [c]ourt cannot review the latter without considering the former.
Here[,] the plaintiffs made a presentation and asked the Board, based on their presentation, to find that the area would look better if the Board allowed them to use the property and rearrange it in accordance with that presentation. Even if they are within the letter of [the] resolution, the plaintiffs are not free to deviate from the assumptions undergirding the variance.

Therefore, since the plaintiffs presented the Miller buildings to the Board at the variance stage, and because the Board apparently believed that those would be the buildings that would be constructed on the site and not the [S]ea/[L]and containers, and because the Board could have, under Burbridge, required those buildings, the [c]ourt finds that it was within the Board's authority to explicitly require Miller buildings as a condition to site plan approval.
[(Emphasis added, footnote deleted).]
We concur with the trial judge's reasoning. This is not a scenario in which the Board has imposed an aesthetic condition upon a site plan out of thin air. The use of Miller buildings was an integral part of the variance application, as manifested by the Dewees correspondence referenced therein. The Board factored the anticipated usage of Miller buildings into its assessment of plaintiffs' ensuing site plan application. In fact, the site layout plan dated May 27, 2005, submitted by plaintiffs as part of their application, conspicuously designates the self-storage units at the rear of the property as "CONCEPTUAL LOCATIONS OF SEA/LAND BOXES AND TRUCK STORAGE (TYP.)" (emphasis added), while labeling the three parallel rows of containers at the front of the property as "PROPOSED STORAGE UNITS" without including the Sea/Land name. This layout plan predates the heated debate about the brand of containers at the ensuing Board hearings in the summer and fall of 2005.
We recognize, as did the trial judge, "[g]enerally subjective aesthetic standards are considered [in the site plan context] to be ultra vires, particularly in the absence of ordinance standards regulating residential architecture." Cox, supra, at § 15-9. The reason for that salutary general principle is that aesthetic *36 factors are usually too subjective to be applied and enforced with consistency and predictability. Most of the time, beauty is indeed "in the eye of the beholder." However, as Burbridge recognizes, aesthetics may legitimately come into play when an applicant's proposed development of the property for a non-permitted use will enhance the appearance of the property and thereby provide "special reasons" for granting a use variance under N.J.S.A. 40:55-70(d). Burbridge, supra, 117 N.J. at 387, 568 A.2d 527.
In Burbridge, the applicant for a variance proposed to reconfigure his auto salvage and repair activities on his property so that, as a "trade-off" for the approved expansion of his storage space, he would relocate all of the nonconforming aspects of his business to the rear of the property, out of view from the street. Id. at 378, 568 A.2d 527. The Court held that the Board properly could rely upon this aesthetic enhancement as a "special reason" under the positive criteria required to authorize a variance. Id. at 386-93, 568 A.2d 527; see also Kohl v. Mayor of Fair Lawn, 50 N.J. 268, 276, 234 A.2d 385 (1967). In doing so, the Court noted that the proper invocation of aesthetic factors has limitations, and that "aesthetic benefits alone will not always justify a substantial expansion of a pre-existing nonconforming use." Burbridge, supra, 117 N.J. at 391, 568 A.2d 527.
We believe that the trial judge appropriately classified this case as one in which aesthetic considerations, in the particularized context of this bifurcated application, were permissibly applied by the Board. At the time plaintiffs were cited by the zoning officer, they had numerous storage containers scattered around the site. Although the issue of interpretation was never resolved, the Township contended that the extant storage activities on the premises were not a conforming use in the H-C Zone. Similar to the "trade-off" involved in Burbridge, plaintiffs thereafter were able to get the Board to ratify their use that was claimed to be nonconforming, and to expand that use with additional containers, while at the same time undertaking to rearrange and upgrade the property so to make those activities less visible to neighbors and the public and more visually appealing. The use of Miller, rather than Sea/Land, storage units was manifestly part of the Board's calculus. The bifurcated application was, in substance, one unified application, as to which aesthetics could properly be considered. As plaintiffs' own witness before the Board in the use variance phase, Van Veldhuisen, stated, "appearance is important" in the self-storage business, both to customers and to neighbors.
We disagree with plaintiffs that the trial court's analysis on this issue conflicts with our disposition in Sheston Oil Co., Inc. v. Borough of Avalon Planning Bd., 214 N.J.Super. 593, 520 A.2d 802 (App.Div.), certif. denied, 107 N.J. 134, 526 A.2d 199 (1987). In Sheston Oil, we invalidated several conditions that a planning board had imposed upon a developer seeking site plan approval for a conforming use, including a condition that the convenience store it sought to build "comply aesthetically with the neighborhood." Id. at 596, 520 A.2d 802. The present context involving a bifurcated application is fundamentally different from the free-standing site plan for a conforming use involved in Sheston Oil.
The trial judge's validation of the Miller brand requirement is further justified by the procedural chronology of plaintiffs' application. As we have noted, plaintiffs presented a use variance application that included as a supporting exhibit, A-2, a series of documents with specifications and depictions of the Miller buildings. The record *37 before us has no indication that plaintiffs, or their experts or representatives, ever told the Board, or the members of the public in attendance at the twelve protracted hearings on the variance application, that they intended to substitute Sea/Land containers for Miller buildings near the front of the property. The Board's November 2004 resolution approving the use variance expressly cross-references plaintiffs' exhibit A-2, depicting the Miller buildings and their specifications. There is no indication that plaintiff lodged an objection to that cross-reference, or sought reconsideration from the Board or judicial relief before proceeding to the site plan phase.
Plaintiffs should not be permitted to take unfair advantage of the land use approval process by promoting their intended use of Miller buildings to the Board and the public at the variance phase and then switching to Sea/Land containers at the site plan phase. See Bray v. Cape May City Zoning Bd. of Adj., 378 N.J.Super. 160, 875 A.2d 254 (App.Div.2005) (noting that judicial estoppel principles may fairly apply to applicants who later take inconsistent positions after obtaining relief from a land use board).
By no means do we invite land use boards when granting variances to invoke positive aesthetic considerations as a pretextual device, thereby enabling them to impose onerous aesthetic conditions upon an applicant later at the site plan phase. We detect no such pretextual conduct by the Board in this case.
Finally, we reject plaintiff's contention that the Board's requirement for the use of Miller buildings near the front of the property is arbitrary and capricious. Our review of the color photographs supplied to us from the record reveals some perceptible visual differences between the Miller buildings and the Sea/Land buildings, even after the Sea/Land buildings are repainted and their doors are reconfigured to attempt to replicate the look of the Miller units. Moreover, the Board demonstrated its overall reasonable approach to plaintiffs by allowing them to retain the numerous Sea/Land containers already situated in the rear of the property, presumably because those containers would be farther from potential view by those who pass by the property. The record contains no indication that Miller buildings are no longer available on the market or are so exorbitantly priced as to render the Board's approval a practical impossibility.[4] Given our deferential standards of review, we cannot conclude that the Board's decision in this respect was a "clear abuse of discretion." Lang, supra, 160 N.J. at 58, 733 A.2d 464.
The trial court's validation of the Board's requirement that Miller storage containers be installed at the front of the property, rather than Sea/Land containers, is affirmed.

B.
Plaintiffs' second contention is that the Board imposed unduly onerous landscaping requirements as a condition of site plan approval. This argument requires little discussion.
The landscaping required by the Board in the site plan resolution included a buffering screen along the property's border *38 with Hope Road and a buffer of evergreen trees along the property's border with an adjoining residential lot. Plaintiffs were also required to construct a stockade fence along that same residential lot border within six months[5] of the Board's resolution, unless their neighbors went ahead with their own plans to build such a fence.
Plaintiffs concede that certain buffering and screening is warranted as part of their expanded commercial development of the premises. Even so, they complain that the landscaping obligations in the resolution exceed the buffering and screening requirements set forth in Section 19-507 of the Township's zoning ordinance. Plaintiffs have since built the fence mandated by the Board, but they consider the other special landscaping obligations prescribed by the resolution to be "more than overkill." Plaintiffs allege that other commercial properties in the H-C zone lack comparable buffering or landscaping, and claim that they have been unfairly singled out by the Board for harsh treatment. They also maintain that the Board's insistence on Miller storage units is unnecessary, in light of the heavy screening and buffering that has been required by the Board.
The trial judge rejected plaintiffs' claims about the landscaping. He noted that Section 19-507(c)(4) of the local ordinance authorizes the Board to require plantings, walls, fencing and other items to "visually shield or obscure" the structures on a property, over and above the basic screening generally called for under Section 19-507(c)(2) of the ordinance (i.e., ten-foot wide strips of land densely planted with evergreens). The judge was not persuaded that the extra screening required by the Board in this case was arbitrary, capricious or unreasonable.
We concur in the trial judge's landscaping analysis. We also are not persuaded by this record that plaintiffs have been the victims of selective enforcement by the Board or that the required use of the Miller units makes the additional landscaping unnecessary. On the contrary, it appears that the container brand designation and the required landscaping operate in tandem to enhance the overall appearance of the property to outsiders. The landscaping is reasonable, particularly given that, as one Board member observed, plaintiffs' property is "the first thing you see as you pull into Blairstown" from that direction on Hope Road, and that the sides of the existing storage units were visible from the road before the added landscaping was required. The commercial property's proximity to the bordering residences is also a legitimate concern.
The record contains more than adequate indicia to support the reasonableness of the required landscaping. We therefore affirm the trial court's disposition of this issue.

C.
Plaintiffs' third point is that the Board went too far in requiring them to pave areas of the property around the storage units where vehicles would be parked during loading and unloading of storage items, rather than simply allowing them to place loose gravel in those parking areas. Plaintiffs note that the program coordinator of the Warren County Soil Conservation District submitted a memorandum to the Board during its consideration of the site plan, in which the District took "no exception *39 to a stone parking lot over a paved parking lot [on plaintiffs' premises] and [felt] that it [stone] could be beneficial." Plaintiffs also repeat their claim that the Board has unfairly singled them out, citing to photographs in the record showing other properties in the Township with vehicles being stored on grass or gravel.
Plaintiffs further urge that stricter storm management requirements adopted by the State Department of Environmental Protection ("DEP") after their site plan was approved, see N.J.A.C. 7:8-1.1 to -6.3, make the paving condition an economic hardship because the amount of impervious surface created by the paving may subject plaintiffs to onerous stormwater retention measures required by the DEP for parcels of their size. Plaintiffs complain that the Board's delay in rendering a final disposition of their bifurcated application caused them to be ineligible for certain "grandfathering" exceptions under the DEP's new regulations.
The trial judge rejected plaintiffs' objections to the paving conditions, finding that they are authorized by the local ordinance. See Blairstown Township Code § 19-511. He also found that the conditions were neither arbitrary nor capricious. In addition, the judge rejected plaintiffs' claim of selective enforcement, and instead accepted the Board's representation that it is equally concerned about getting other commercial properties in the Township paved.
We agree with the judge's assessment. We also note that the Board was not bound by the advice of the County Soil Conservation District officer, and that it had the prerogative to require a greater surface barrier to protect the groundwater and soil from oily seepage from cars and trucks that will make use of the storage facilities.
Plaintiffs do raise a legitimate compliance issue as to the new stormwater regulations. We need not pass upon whether plaintiffs' commercial property is or is not a "major development" subject to the new regulations. See Save Hamilton Open Space v. Hamilton Twp. Planning Bd., 404 N.J.Super. 278, 284-87, 961 A.2d 732 (App.Div.2008) (construing the DEP's stormwater management regulations and the role of local zoning boards in the implementation and compliance with those regulations). Rather, we reserve that issue in anticipation of the Board's future consideration of a potential hardship application by plaintiffs, if it becomes clear that the project is indeed subject to the new stormwater requirements and plaintiffs are disadvantaged by the intervening change in the law.[6] Once presented with such a formal application, with proper notices to the public, the Board may reconsider the necessity of the paving requirements, or the need for the full extent of that paving, in light of the collateral impacts that may ensue from the new DEP regulations.
The trial court's validation of the paving condition is therefore affirmed, without prejudice to a future hardship application before the Board.

D.
Plaintiffs' final contention is that the trial court erred in upholding the March 14, 2006 resolution's condition that "[t]his site plan and subdivision approval is specifically contingent upon [plaintiffs] complying with all of the applicable conditions of *40 this approval within one (1) year of the memorialization of this [Board] action." The condition further states that "[f]ailure on the part of [plaintiffs] to bring the property into compliance with the terms of this site plan and subdivision approval shall result in the voiding of these approvals."
Plaintiffs argue that this one-year time limit conflicts with the statutory time protections afforded to developers under the MLUL. On this discrete point, we agree with plaintiffs.
N.J.S.A. 40:55D-52(a) grants time protection to a developer from changes in zoning ordinances, or other rights conferred by the grant of a site plan, for two years after the application has been approved. That statute specifically creates the two-year window of protection to insulate a developer against changes to "[t]he zoning requirements applicable to the preliminary approval first granted and [to] all other rights conferred upon the developer pursuant to section 37 of P.L.1975, c. 291 (C.40:55D-49), whether conditionally or otherwise[.]" N.J.S.A. 40:55D-52(a) (emphasis added). Moreover, N.J.S.A. 40:55D-49, which is cross-referenced in N.J.S.A. 40:55D-52(a), establishes:
That the general terms and conditions on which preliminary approval was granted shall not be changed, including but not limited to use requirements . . . and, in the case of a site plan, any requirements peculiar to site plan approval pursuant to section 29.3 of P.L. 1975, c. 291 (C.40:55D-41); except that nothing herein shall be construed to prevent the municipality from modifying by ordinance such general terms and conditions of preliminary approval as relate to public health and safety[.]
[N.J.S.A. 40:55D-49 (emphasis added).]
Read together, these statutes allow plaintiffs to retain the rights conferred upon them by the final site plan approval for at least two years. See also R.J.P. Builders, Inc. v. Twp. of Woolwich, 361 N.J.Super. 207, 216-17, 824 A.2d 1114 (App.Div.), certif. denied, 178 N.J. 31, 834 A.2d 404 (2003); Toll Bros., Inc. v. Twp. of Greenwich, 244 N.J.Super. 514, 520, 582 A.2d 1276 (App.Div.1990).
Among the site plan considerations listed in N.J.S.A. 40:55D-41 are the landscaping and screening requirements that plaintiffs have, among other things, challenged here. See N.J.S.A. 40:55D-41(c). The paving conditions imposed by the Board likewise are reasonably within the two years of statutory protection, as they respectively relate, at least in part, to the "[p]reservation of existing natural resources on the site," N.J.S.A. 40:55D-41(a), such as groundwater, and to the "[s]afe and efficient vehicular and pedestrian circulation, parking and loading." N.J.S.A. 40:55D-41(b).
The condition requiring the Miller units does not appear to fit neatly within the categories of N.J.S.A. 40:55D-41, which is explainable by the fact that aesthetics ordinarily are not to be factored into general site plan considerations. However, inasmuch as the Board's requirement of Miller units stemmed, as we have noted, from the use variance granted in the earlier bifurcated proceeding, the brand designation reasonably may be construed as implicitly part of the "use requirements" referenced in N.J.S.A. 40:55D-49, and thus likewise subject to the two years of statutory protection.
The trial judge found the one-year condition was authorized under the Township's ordinance at Section 19-706(F)(5)(a). That section of the ordinance provides that when the Board interposes site plan conditions that are intended to be completed *41 "before the approval becomes effective," those conditions become "null and void" unless they are fulfilled "within six (6) months of the date the approval was granted,. . . unless a longer time period is specified by the Board." See Blairstown Township Code § 19-706(F)(5)(a). The trial judge found that the three substantive conditions at issue herethe container brand, landscaping and pavingwere such conditions "intended to be fulfilled before the approval becomes effective."
We differ with the judge's classification of the substantive conditions and his interpretation of the time provisions in the ordinance. The conditions in question consist of "conditions subsequent" to the granting of site plan approval, not "conditions precedent" to Board approval within the logical scope of Section 19-706(F)(5)(a). As noted in the Cox treatise, "[c]onditions precedent are those intended to be fulfilled before approval takes effect. Conditions subsequent relate to conditions which must be fulfilled after final approval has been given." Cox, supra, § 16-7(a). Conditions precedent are not governed by the two-year requirement of N.J.S.A. 40:55D-52(a), and can be subject to a lesser time requirement as may be established by municipal ordinance. Ibid. As examples of conditions precedent that might not be covered by the two-year statute, the Cox authors cite "fil[ing] a revised map, post[ing] performance guarantees in a stated amount and obtain[ing] approval from the Department of Transportation for a proposed opening onto a state highway." Ibid.
Additionally, in another section of the treatise, the Cox authors acknowledge that required "improvements" to the property are similar to conditions subsequent to approval and thus fall under the protection of the two-year statute. Id. § 16-6.2 (citing R.J.P. Builders, supra, 361 N.J.Super. at 216-17, 824 A.2d 1114). The paving, landscaping, and construction of new storage containers are all such conditions subsequent and governed by N.J.S.A. 40:55D-52(a).
Consequently, the one-year deadline imposed by the Board in this case runs afoul of both the MLUL and case law. Plaintiffs gained the right to implement their site plan after its final approval, and that right could not be removed from them within the two-year statutory period.
Notably, the Board's brief on appeal offered no substantive explanation for why the trial court's analysis of the one-year requirement was correct, but simply adopted the court's conclusion. The Board then asserted in its brief that even if the ordinance and statutes are read to confer a two-year period of protection, plaintiffs have expended that full two-year period in litigating this matter and the propriety of the resolution's one-year deadline is therefore moot. We do not subscribe to that inequitable position, and the Board's counsel yielded on that point at oral argument before us.
Plaintiffs in this case should not be deprived of the temporal benefits of protection under the MLUL because they chose to litigate their differences with the Board in the Law Division and then seek review of the Law Division's ruling in this appeal. The pendency of the litigation, which was based upon good-faith (albeit not successful) arguments by plaintiffs and their counsel, equitably tolled the two-year period of protection. See Friends of Peapack-Gladstone v. Borough of Peapack-Gladstone, 407 N.J.Super. 404, 431, 971 A.2d 449 (App.Div.2009); S.T.C. Corp. v. Planning Bd. of Hillsborough, 194 N.J.Super. 333, 336, 476 A.2d 888 (App.Div.1984).
Lastly, we find the one-year condition in the site plan resolution, which we *42 have declared invalid, is severable from the remaining conditions that we have sustained. Berninger v. Bd. of Adj. of Midland Park, 254 N.J.Super. 401, 407, 603 A.2d 954 (App.Div.1991) (excising as severable an invalid land use condition), aff'd, 127 N.J. 226, 603 A.2d 946 (1992).
The judgment of the Law Division is affirmed in all respects except it is reversed as to the court's validation of the one-year time condition. The matter is remanded to the Board for the ministerial adoption of a corrective resolution changing the one-year condition to a two-year condition, consistent with the MLUL. We do not retain jurisdiction.
Affirmed in part, reversed in part, and remanded.
NOTES
[1] We have not been supplied with transcripts of the Board's hearings on the use variance, which apparently were not presented to the trial court. Nonetheless, we do have the extensive transcripts from the Board's hearings on the site plan, as did the trial court. The record is adequate for us to decide the issues on appeal without the use variance transcripts.
[2] The Board has not cross-appealed the court's invalidation of these two conditions.
[3] Our understanding of the record is that one of the three rows of containers was already installed before the Board's final decision on the site plan, and that they are Miller units. If we are incorrect about that fact, it does not affect our legal analysis.
[4] We affirm the brand designation because of the unique chronology before us, and do not address whether, as a general practice, land use conditions may properly be tied to requirements to use specific product vendors in the development of the property. Nothing in this opinion should be construed as an endorsement of anti-competitive practices or brand favoritism.
[5] This shorter time condition is distinguishable from the one-year deadline otherwise imposed by the Board for compliance with the general conditions of the resolution. See Part II(D), infra.
[6] At oral argument before us, the Board's attorney acknowledged that plaintiffs have the right to present such a future hardship application to the Board, based on the change in the law.